IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

_____

KAISER FOUNDATION HEALTH PLAN,      )
INC., a foreign non-profit          )
corporation,                        )
                                    )
          Plaintiff,                )
                                    )
vs.                                 ) Civ. No. 16-00073 ACK-KSC
                                    )
HAWAII LIFE FLIGHT CORPORATION, a   )
Hawaii corporation, and AIR         )
MEDICAL RESOURCE GROUP, INC., a     )
Utah Corporation,                   )
                                    )
          Defendants.               )
_____)
                                    )
HAWAII LIFE FLIGHT CORPORATION, a   )
Hawaii corporation,                 )
                                    )
          Counterclaim Plaintiff,   )
                                    )
vs.                                 )
                                    )
KAISER FOUNDATION HEALTH PLAN,      )
INC., a foreign non-profit          )
corporation,                        )
                                    )
          Counterclaim Defendant.   )
_____)


<u>ORDER GRANTING IN PART AND DENYING IN PART COUNTERCLAIM
DEFENDANT KAISER FOUNDATION HEALTH PLAN, INC.'S
MOTION TO DISMISS COUNTERCLAIM PLAINTIFF HAWAII LIFE FLIGHT
CORPORATION'S FIRST AMENDED COUNTERCLAIM</u>

# TABLE OF CONTENTS

<u>PROCEDURAL BACKGROUND</u>..............................................3

<u>FACTUAL BACKGROUND</u>.................................................7

<u>STANDARD</u>..........................................................14

<u>DISCUSSION</u>........................................................16

   I.   Count I: Unfair Competition Claim ......................16

      A. Whether a Violation of EMTALA Constitutes Unfair
         Conduct..............................................17

      B. Whether HLF Has Failed to Allege Injury to
         Competition..........................................26

   II.  Count II: Intentional Interference with Contract Claim ..40

      A. Whether KFHP Intentionally Induced Hospitals to Breach
         Their FCAs...........................................41

      B. Whether KFHP's Actions Were Not Justified............47

   III. Count III: ERISA Claim ................................50

   IV.  Count IV: Breach of Contract Claim .....................56

      A. Judicial Notice of Documents.........................56

      B. Whether HLF Has Asserted a Ripe Claim Regarding KFHP's
         Indemnity Promises...................................60

         1. Interpretation of the Indemnity Offer ..............60

         2. Ripeness .........................................63

      C. Whether HLF Validly Received an Assignment of the
         Indemnity Rights and Has Standing....................68

      D. Whether ERISA Preempts Count IV.....................71

<u>CONCLUSION</u>........................................................82

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Plaintiff-Counter Defendant Kaiser Foundation Health Plan Inc.'s Motion to Dismiss Hawaii Life Flight Corporation's First Amended Counterclaim.

## PROCDURAL BACKGROUND

This matter involves Defendant-Counter Plaintiff Hawaii Life Flight Corporation's ("HLF") efforts to recover its billed charges for the provision of air ambulance services in Hawaii.  First Am. Counterclaim, ECF No. 92 ("FACC"), ¶ 1.  As evidenced by the parties' briefing, this case has an extensive procedural background and presents intricate claims which require resolution of complex factual and legal questions in order to determine responsibility for the cost of providing air ambulance transport services among the Hawaiian islands.  Both the parties and the Court are familiar with the history of this case, and the Court will not repeat it here in full.[1]

This case is related to a lawsuit in which Toby Sidlo filed a class action complaint on July 15, 2015 against Kaiser Permanent Insurance Company ("KPIC") and Kaiser Foundation Health Plan, Inc. ("KFHP") alleging claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §

---

[1] The Court also incorporates by reference its prior orders from October 31, 2016 (ECF No. 56) and November 17, 2016 (ECF Nos. 76-77).

1001 et seq. seeking to recover health care benefits and to enforce plan benefits. ECF No. 56 at 2-3; Sidlo v. Kaiser Permanent Insurance Company, CV No. 15-00269 ACK-KSC ("Sidlo"). Sidlo and HLF also entered into a Joint Litigation Agreement ("JLA") on July 15, 2015. ECF No. 56 at 22-23.

Separately, on February 18, 2016, KFHP filed a complaint in the instant case against HLF and its parent company Air Medical Resource Group, Inc. ("AMRG") alleging that HLF and AMRG had violated the anti-assignment provision in KFHP's ERISA plans in Hawaii by attempting to procure assignment of members' rights and benefits. Id. at 4-5. Specifically, KFHP alleged that the Sidlo litigation was brought by HLF and/or AMRG in Sidlo's name. Id. at 5. On April 6, 2016, this Court consolidated the Sidlo and KFHP actions as both cases "involve[d] a determination as to whether [Sidlo's] purported assignment of rights to [HLF} was valid." ECF No. 29; Sidlo, ECF No. 85.[2] HLF then filed a counterclaim against KFHP on April 14, 2016 alleging four claims: (1) unfair competition in violation of Hawaii Revised Statutes ("HRS") § 480-2; (2) tortious interference with contract; (3) defamation; and (4) trade libel/disparagement. Id. at 5-6.

---

[2] In the Order Consolidating Cases, the Court noted that Sidlo agreed to consolidation for purposes of discovery. ECF No. 29 at 2 n.1; Sidlo, ECF No. 85 at 2 n.1; see also ECF No. 56 (noting consolidation for purposes of discovery).

In its October 31, 2016 Order, this Court addressed cross-motions for summary judgment filed by Sidlo and by KFHP and KPIC in the Sidlo action. ECF No. 56 at 8-9. HLF and AMRG also filed a joinder to Sidlo's motion. Id. at 9. The Court denied Sidlo's motion and granted KFHP and KPIC's motion in part and denied it in part. Id. at 77-78. In so holding, the Court concluded that Sidlo had standing, that the Inter-Facility Transport Policy applied to Sidlo's claim, and thus that Sidlo did not suffer an adverse benefit determination and could not seek review of a claim denial. See generally id. Additionally, the Court denied Sidlo's claims regarding notice of material modifications to the benefits plan arising from KFHP's offer of indemnification regarding HLF's claims, KFHP's alleged breach of fiduciary duty, and equitable estoppel for misrepresentations of rights under the contracts. See generally id. Finally, the Court dismissed Sidlo's claims regarding equitable indemnification as not ripe because HLF had not yet sued Sidlo, nor had Sidlo made any payment or discharged any legal obligation to HLF, so KFHP's alleged offer of indemnification was not yet applicable. See id. at 77. Sidlo filed a notice of appeal regarding this Order on November 29, 2016. Sidlo, ECF No. 516.

The Court issued two orders in the instant case on November 17, 2016. In the first, it determined that the anti-

assignment provision in KFHP's plans did not apply to health care providers, and thus the plan members could assign their rights to HLF.  See ECF No. 76.  In the second, the Court addressed KFHP's motion to dismiss HLF's counterclaim.  The Court held that to the extent HLF's counterclaim was based on communications with plan members, the claims were preempted, ECF No. 77 at 22; but to the extent they were based on communications with hospitals, the Court could not definitively determine whether they pertained to KFHP's ERISA plans for purposes of preemption.  Id. at 23-24.  The Court also dismissed without prejudice HLF's unfair competition counterclaim as it was unclear what false or misleading statements were made or what the nature of the competition injured was.  Id. at 29.  In sum, the Court dismissed HLF's counterclaim with prejudice to the extent it was based on communications with members but otherwise granted leave to amend the other claims.  Id. at 32.[3]

The Court deconsolidated the cases on November 30, 2016.  ECF No. 89.  HLF filed its FACC in the instant case on January 4, 2017, again alleging four claims.  ECF No. 92.  KFHP filed the instant Motion to Dismiss on February 10, 2017.  ECF No. 99 ("Motion").  HLF filed its Opposition on March 2, 2017.

_____

[3] Each of these orders was filed both in the instant case as ECF Nos. 56, 76, and 77 and in the Sidlo litigation, as ECF Nos. 487, 507, and 508, respectively.

ECF No. 103 ("Opp."). KFHP filed its Reply on March 9, 2017. ECF No. 104 ("Reply").

This Court held a hearing on KFHP's Motion on March 23, 2017.

## FACTUAL BACKGROUND

HLF provides air ambulance services throughout the State of Hawaii, transporting patients by helicopter or fixed wing aircraft to hospitals and medical centers which are equipped to handle a patient's emergency medical condition, which may include transport from neighboring islands. Compl. ¶ 12. HLF is not a self-dispatching service; its "emergency flights are only dispatched by attending physicians and hospitals" when there is a qualified emergency. Id. ¶ 14. Many hospitals have entered into contracts with HLF to provide air ambulance services. Id. ¶ 25. These contracts contain First Call Agreements ("FCAs") with HLF in exchange for HLF placing an aircraft at or near the hospital. Id. The FCAs provide that when air ambulance services are necessary, the hospital will call HLF first, provided that using HLF meets the requirements of the Emergency Medical Treatment & Active Labor Act ("EMTALA").[4] Id.

---

[4] EMTALA, 42 U.S.C. § 1395dd, provides that a hospital may not transfer an individual whose "emergency medical condition has (Continued...)

KFHP is an insurer and administrator for various
insured employee welfare benefit plans providing health
insurance coverage.  Id. ¶ 28.  KFHP is also a fiduciary under
ERISA and is responsible for determining coverage and
eligibility of participants and beneficiaries for benefits under
the plans.  Id. ¶ 29.  Until August or September 2013, KFHP and
HLF had a contract governing reimbursement rates, pursuant to
which "HLF accepted as payment in full an average rate from KFHP
that was less than the total billed rate HLF charged for a
transport."  ECF No. 56 at 12; see also Sidlo, ECF No. 324-1 at
6 (KFHP asserted that HLF accepted on average $10,638 from KFHP
in payment where full billed charges averaged $32,279 per
transport).  However, KFHP grew concerned with HLF's increasing
rates and entered into a contract with American Medical Response
("AMR"), HLF's only competitor for air medical services in
Hawaii.[5]  Id. at 12.  HLF then appears to have terminated its
contract with KFHP.  Id. at 12-13.

---

not been stabilized" unless the transfer is appropriate and
defines what constitutes an appropriate transfer.

[5] Although AMR was not named in the FACC; based on the filings in
the Sidlo litigation, the Court is aware that the competitor
referenced in the FACC is AMR (not to be confused with HLF's
parent company AMRG).  Based on information from the Sidlo
matter, AMR appears to have entered the market shortly before it
signed the contract with KFHP in September 2013.  Sidlo, KFHP's
Supplemental Motion for Summary Judgment, ECF No. 285-1 at 4
("To avoid HLF's rapidly increasing prices, KFHP entered into a
long-term contract with AMR, a new air transport company in
(Continued...)

HLF has alleged in its FACC that in connection with
its health insurance services, KFHP has improperly made written
and oral demands that hospitals arrange for "emergency
transportation of patients through or as designated by KFHP" and
has implemented procedures requiring hospitals to use air
ambulance services provided by AMR.[6]  FACC ¶ 5.  In the <u>Sidlo</u>
litigation, HLF submitted to the Court with KFHP's consent
correspondence that KFHP sent to Hawaii Health Systems
Corporation ("HHSC") concerning the use of HLF's air ambulance
services by Kona Community Hospital ("KCH"), an HHSC facility.
ECF No. 77 at 9.  HLF has an FCA with KCH which is set to expire
on October 31, 2017.  <u>Id.</u>  On March 19, 2015, KFHP sent HHSC a

Hawaii, in September 2013.") (relying on Decl. of Thomas Risse ¶
3, <u>Sidlo</u>, ECF No. 287-1).
[6] HLF has alleged that its own FCAs "recognize that the treating
physician under EMTALA is free to call upon an alternative
transportation service provider if a patient has an [emergency
medical condition]" and thus the FCAs do not violate EMTALA.
<u>See</u> FACC ¶ 25.  HLF alleges that KFHP's pre-authorization
mandate to hospitals, by contrast, applies "regardless of
whether the patient has an EMC" and thus violates EMTALA.  <u>See</u>
<u>id.</u> ¶ 26.  KFHP asserted at the hearing that its pre-
authorization requirement only covers non-emergency conditions
and still allows hospitals to select the air transport provider
in an emergency situation as required by EMTALA, citing a letter
from March 19, 2015 discussed <u>infra</u> at 10-11.  However, this
Court may not decide which party's interpretation is correct on
a motion to dismiss.  The Court also notes that HLF has alleged
that KFHP's pre-authorization demands were made regardless of
whether patients were in an unstabilized condition, and that
KFHP's March 19, 2015 letter is not definitive on this issue.
The Court thus must accept as true at this stage that at least
some of the flights at issue involved patients in an unstable
condition.

cease-and-desist letter asserting that KCH's Dr. Richard McDowell had been preventing hospital staff from using AMR and had been directing the use of HLF instead. Id.; see also ECF No. 74-2 (letter). At the hearing held on April 4, 2017, this Court allowed HLF's request to refer to the contents of this letter in discussing the oral and written demands HLF has alleged KFHP made to hospitals. ECF No. 106 at 28-29 (Tr. of H'ring); see also id. at 10 (KFHP also referencing the contents of this letter).[7]

In the letter, KFHP asserted that Dr. McDowell's actions constituted a breach of contract between KFHP and HHSC, which contract required HHSC to, among other things: "(i) notify Kaiser within 48 hours of a Kaiser member presenting to one of the HHSC facilities"; "(ii) cooperate with Kaiser in transferring Kaiser members to the Moanaluna Medical Center"; and "(iii) provide services in the most cost effective manner." ECF No. 74-2; ECF No. 77 at 10. In addition, the letter noted

---

[7] Pursuant to Federal Rule of Evidence 201(c)(1), a court "may take judicial notice on its own." The Court will take judicial notice of this letter, as it is central to the theories of HLF's direct claims, both parties referred to it at the April 4, 2017 hearing, and the authenticity does not appear to be in dispute as both parties consented to the Court's prior consideration of this letter in the instant matter and the Sidlo action. See ECF No. 74; Sidlo, ECF No. 505 (indicating that both parties consented to review of this letter, among other documents); see also infra at 15-16, 57-58 (discussing standards for judicial notice).

that Dr. McDowell's conduct constituted intentional interference with KFHP's agreements with AMR and HHSC.  ECF No. 74-2.  KFHP also responded to Dr. McDowell's professed EMTALA concerns on the basis that the patients transported were in stable condition so EMTALA did not apply; as such, KFHP disagreed that KCH or HHSC should "dictate the mode of transportation, especially when Kaiser has medical and financial responsibility for the patient's post stabilization care."  ECF No. 74-2.

In its FACC, HLF additionally alleged that approximately 129 of KFHP's members were transported by HLF for "medically necessary air medical transport services."  Id. ¶ 30. These individuals have assigned to HLF all rights, title, and interest in the plan related to the services HLF provided.  See id. ¶¶ 6, 31-159 (hereinafter, "Assignors" or "members").  HLF has asserted that for many of the transports it provided to KFHP's members, KFHP has refused to pay HLF's charges.  Id. ¶ 6. Instead, KFHP apparently unilaterally decided to pay 200% of the allowable Medicare payment per transport, which is less than HLF's claimed charge.  Id. ¶ 172.

Section G of KFHP's plans governs reimbursement of "Ambulance Services."  Id. ¶ 161.  It provides that KFHP will pay 80% of "Applicable Charges" for ambulance services deemed necessary by a physician.  Id.  What constitutes the applicable charge depends on who provides the service.  See id. ¶ 162.

Member rates are used when a "Medical Group" or "Health Plan Hospital" provides the service.  Id.  For contracted Medical Groups or Health Plan facilities, the applicable charge is the negotiated rate.  Id.  For non-contracted facilities and providers, the applicable charge is the actual billed charge. Id.  As HLF and KFHP do not currently have a negotiated rate, HLF asserts that KFHP is obligated to pay no less than 80% of HLF's actual billed charges.  Id. ¶ 163.

KFHP has asserted that Section G does not apply to transports between facilities; rather, it covers 100% of the costs of such transports pursuant to its Inter-Facility Transport Policy regardless of whether the provider has contracted with KFHP.  Id. ¶¶ 165-166.  This Court previously held in the Sidlo litigation that the Inter-Facility Transport Policy, not Section G, applied to Sidlo's claims.  ECF No. 56 at 41-52.

HLF has alleged that it believes KFHP has informed the Assignors that they "have no obligation to pay any amount to HLF" and should not do so, that KFHP would protect Assignors from any claim for payment by HLF, and that KFHP would reimburse Assignors for any amounts paid to HLF.  Id. ¶ 168.  In addition, KFHP has agreed to indemnify the Assignors for "any amount that might be deemed due and owing to HLF."  Id. ¶ 169.  HLF has contacted each of the Assignors, except Toby Sidlo, advising

them of the amount KFHP failed to pay and requesting that payment be made to HLF for the unpaid amounts.  Id. ¶ 175.

Based on the foregoing, HLF brought four counterclaims in its FACC, two direct claims and two derivative claims based on the assignment of rights to HLF.  Count I is a direct claim for unfair competition pursuant to HRS § 480-2, based on KFHP's requirement that hospitals obtain authorization from KFHP before arranging emergency transport, in violation of EMTALA and the Affordable Care Act ("ACA").  Id. ¶¶ 177-198.  KFHP allegedly used its economic power to cause hospitals to breach the FCAs with HLF and utilize the inferior air transport services offered by HLF's competitor.  Id. ¶¶ 186-89, 191.  Count II asserts a direct claim for tortious interference with contract, grounded in the fact that KFHP allegedly knew about the FCAs between HLF and the hospitals and caused the hospitals to breach the FCA agreements and utilize AMR instead.  Id. ¶¶ 199-205.

Count III asserts a derivative claim to recover health care benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), because KFHP has allegedly underpaid the Assignors' claims for the air medical transportation services HLF provided.  Id. ¶¶ 206-217. In addition, HLF seeks to "clarify and enforce Assignor's rights to payment of those amounts still due and owing" through an injunction.  Id. ¶ 219.  Finally, Count IV asserts a derivative claim for breach of KFHP's indemnification promises to the

Assignors, under which HLF asserts KFHP is obligated to pay 100% of the amounts HLF claims it is still owed.  Id. ¶¶ 222-228.

**STANDARD**

Rule 12(b)(6) authorizes the Court to dismiss a complaint that fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Court may dismiss a complaint either because it lacks a cognizable legal theory or because it lacks sufficient factual allegations to support a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

In resolving a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true.  Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 783 (9th Cir. 2012).  "[O]nly pleaded facts, as opposed to legal conclusions, are entitled to assumption of truth."  United States v. Corinthian Colls., 655 F.3d 984, 991 (9th Cir. 2011). A "formulaic recitation of the elements of a cause of action" will not defeat a motion to dismiss.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

"The plausibility standard . . . asks for more than a
sheer possibility that a defendant has acted unlawfully." Id.
"Where a complaint pleads facts that are 'merely consistent
with' a defendant's liability, it 'stops short of the line
between possibility and plausibility of entitlement to relief.'"
Id. (quoting Twombly, 550 U.S. at 557). "In considering a
motion to dismiss, the court is not deciding whether a claimant
will ultimately prevail but rather whether the claimant is
entitled to offer evidence to support the claims asserted."
Tedder v. Deutsche Bank Nat. Trust Co., 863 F. Supp. 2d 1020,
1030 (D. Haw. 2012) (citing Twombly, 550 U.S. at 563 n.8).

Under Rule 12(b)(6), review is generally limited to
the contents of the complaint. Sprewell v. Golden State
Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v.
Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996). However, courts
may "consider certain materials — documents attached to the
complaint, documents incorporated by reference in the complaint,
or matters of judicial notice — without converting the motion to
dismiss into a motion for summary judgment." United States v.
Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). The Court may also
consider documents whose contents are alleged in a complaint and

whose authenticity is not questioned by any party.  Davis v.
HSBC Bank Nev., N.A., 691 F.3d 1152, 1160 (9th Cir. 2012).

If the Court dismisses the complaint, it should grant
leave to amend regardless of whether a request has been made,
unless it determines that the pleading cannot be cured by new
factual allegations.  OSU Student All. v. Ray, 699 F.3d 1053,
1079 (9th Cir. 2012).  Leave to amend "is properly denied,
however, if amendment would be futile."  Carrico v. City & Cty.
of S.F., 656 F.3d 1002, 1008 (9th Cir. 2011).

## DISCUSSION

### I.    Count I: Unfair Competition Claim

Hawaii Revised Statutes § 480-2(a) prohibits "[u]nfair
methods of competition and unfair or deceptive acts or practices
in the conduct of any trade of commerce."  The statute provides
that it should be construed with "due consideration to the
rules, regulations, and decisions of the Federal Trade
Commission and the federal courts interpreting section 5(a)(1)
of the Federal Trade Commission Act."  HRS § 480-2(b); Davis v.
Four Seasons Hotel Ltd., 122 Haw. 423, 446, 228 P.3d 303, 326
(2010) ("This court has similarly recognized that Hawaii's
consumer protection laws are also intended to preserve
competition.").

In order to bring a claim for unfair methods of
competition pursuant to HRS § 480-2, the Hawaii Supreme Court

has clarified that plaintiffs must "qualify as persons who may bring a claim under HRS § 480-2(e)" and that they "have standing to bring a private claim for unfair competition under HRS §§ 481B-14 and 480-2 only if they satisfy the requirements of § 480-13." Soule v. Hilton Worldwide, Inc., 1 F. Supp. 3d 1084, 1094-95 (D. Haw. 2014) (Kay, J.) (citing Davis, 122 Haw. at 446 (2010)). "The essential elements of a claim for unfair competition [under § 480-13] are: (1) a violation of Chapter 480; (2) that causes an injury to plaintiffs' business or property; and (3) damages." Id. at 1095. "To satisfy the second element, plaintiffs must allege an injury in fact and the nature of the competition" and "must ultimately show that their injury necessarily stems from the negative effect on competition caused by the violation as opposed to some pro-competitive or neutral effect of the defendant's antitrust violation." Id.

**A. Whether a Violation of EMTALA Constitutes Unfair Conduct**

KFHP first asserts that HLF may not bring an unfair competition claim predicated on a violation of EMTALA, as HLF has no actionable claim against KFHP under that statute. Motion at 8-11. HLF responds that its claim is that "Kaiser's use of its economic power to force hospitals to seek insurance preauthorization for emergency services, in a manner that is

contrary to the ACA and EMTALA, is unfair and contrary to public

policy." Opp. at 9 (footnote omitted).[8]

The Court first turns to the issue of whether HRS §

480-2 requires an independently actionable predicate claim. The

Hawaii Supreme Court does not appear to have spoken directly on

this issue, but it has recognized that "unfair" means "conduct

that (1) threatens an incipient violation of an antitrust law,

or (2) violates the policy or spirit of one of those laws

because its effects are comparable to or the same as a violation

of the law,[9] or (3) otherwise significantly threatens or harms

---

[8] Like EMTALA's delegation of authority to the treating hospital
or physician to choose the emergency air transport provider, 42
U.S.C. § 1395dd, the regulations governing the ACA state that
an insurance plan or issuer must cover emergency services
"[w]ithout the need for any prior authorization determination,
even if the emergency services are provided on an out-of-network
basis." 29 C.F.R. § 2590.715-2719A(b)(2)(i). KFHP's alleged
mandate to hospitals to obtain pre-authorization for emergency
transports, if true, would implicate EMTALA and the ACA in the
same way. As the FACC and the parties' briefing focuses on
EMTALA, the Court will do likewise here.

[9] The Court notes that this second definition of "unfair conduct"
may appear to allow claims based on the violation of any law's
policy or spirit. However, read according to its plain language
this formulation permits only violations of an antitrust law's
policy or spirit, as it refers to "those laws" stated in the
first definition, which relate to antitrust. Cf. Hungate v. Law
Office of David B. Rosen, 139 Haw. 394, 391 P.3d 1 (2017) (where
statutory language is unambiguous, courts "give effect to plain
and obvious meaning"). In addition, interpreting "those laws"
to refer to competition-related laws accords with the scope of
the other two definitions. See State v. Crouser, 81 Haw. 5, 13
n.6, 911 P.2d 725, 733 (1996) (in interpreting legal texts, the
meaning of words or phrases may be determined by reference to
those associated with it under the principle of noscitur a
(Continued...)

competition." <u>Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe</u> <u>Transp. Co.</u>, 91 Haw. 224, 255 n.34, 982 P.2d 853, 884 n.34 (1999) (citing <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular</u> <u>Tel. Co.</u>, 20 Cal. 4th 163, 186, 973 P.2d 527, 544 (1999)). In addition, "competitive conduct is unfair when it offends established public policy and when the practice is immoral unethical, oppressive, unscrupulous or substantially injurious to customers." <u>Id.</u> (internal citation and quotation omitted); <u>see also</u> <u>FTC v. Sperry & Hutchinson Co.</u>, 405 U.S. 233, 244 n.5 (1972) (describing the factors the FTC uses in determining whether a practice is unfair as "offend[ing] public policy," "immoral, unethical, oppressive, or unscrupulous," or "caus[ing] substantial injury to consumers (or competitors or other businessmen)").

     The Hawaii Supreme Court has also noted that HRS § 480-2 "was constructed in broad language in order to constitute a flexible tool to stop and prevent unfair competition and fraudulent, unfair or deceptive business practices for the

---

sociis). <u>Cf.</u> <u>Island Tobacco Co. v. R.J. Reynolds Indus., Inc.</u>, 513 F. Supp. 726, 737 (D. Haw. 1981) ("Unfair trade practices which violate the spirit of the antitrust laws fall within the purview of the [FTCA]."); <u>Bartleys Town & Country Shops, Inc. v.</u> <u>Dillingham Corp.</u>, 530 F. Supp. 499, 514 (D. Haw. 1982) (discussing with approval a Seventh Circuit case noting that the FTCA was "designed to restrain practices as unfair" which had not yet but were likely to grow into "Sherman Act dimensions" if unrestrained).

protection of both consumers and honest businessmen and businesswomen." Robert's Haw. Sch. Bus, 91 Haw. at 255 n.34, 982 P.2d at 884. "Whether competition is unfair or not generally depends on the surrounding circumstances of the particular case. What is harmful under certain circumstances may be beneficial under different circumstances." Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc., 113 Haw. 77, 108, 148 P.3d 1179, 1210 (2006) ("HMA") (internal quotation marks and citation omitted).

Hawaii's unfair competition law appears to be narrower than, for example, California's similar law, in terms of what conduct is rendered actionable as unfair competition. Hawaii's law appears to target conduct that is either anticompetitive or that offends public policy. By contrast, California defines unfair competition to "include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising". Cal. Bus. & Prof. Code § 17200. "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." Cel-Tech Commc'ns, 20 Cal. 4th at 180, 973 P.2d at 539-40 (1999) (internal citation and quotation omitted). California thus explicitly appears to make actionable via its unfair competition law a broad swath of illegal acts

that a plaintiff would otherwise be unable to bring.[10]  Hawaii's

law, in comparison, does not, on its face, render otherwise

illegal acts independently actionable in an unfair competition

suit except to the extent those illegal acts harm competition or

offend the public policy of competition-related laws.

The Hawaii Supreme Court's discussion in Whitey's Boat

Cruises, Inc. v. Napali-Kaui Boat Charters, Inc. is instructive

on this point.  110 Haw. 302, 132 P.3d 1213 (2006).  In that

case, the court addressed whether the plaintiff could bring a

common law unfair competition claim based on its competitors'

failure to obtain the proper permits for operating boat

charters.[11]  Id. at 312, 132 P.3d at 1223.  The court affirmed

summary judgment for the defendants, finding that there was no

private right of action for damages for the failure to obtain

_____

[10] It is for this reason that HLF's citation to Coast Plaza
Doctors Hospital v. UHP Healthcare, 105 Cal. App. 4th 693, 705
(2002) for the proposition that courts have allowed unfair
competition claims for alleged violations of EMTALA, Opp. at 9,
is not persuasive.  Because California defines unfair
competition to include otherwise unlawful practices, a plaintiff
alleging unfair competition in California could base its claim
on a violation of EMTALA regardless of whether it had an
independent right to sue under EMTALA itself or whether a
violation of EMTALA affects competition.  In any event, the
Court is not bound to follow the holding of this particular case
and declines to do so here.
[11] Although HLF asserts that Whitey's Boat Cruises is
distinguishable because it dealt with a common law unfair
competition claim, as opposed to a statutory claim, HLF has not
provided, nor has the Court been able to locate, any authority
addressing how that difference might be relevant in interpreting
the type of conduct Hawaii courts consider unfair.

the permits, as the "regulations were not promulgated with the objective of protecting business interests or competition but rather with the objective of protecting and preserving the environment for the general public." Id. at 313, 318, 132 P.3d at 1224, 1229.

The reasoning in Whitey's Boat Cruises accords with the Hawaii Supreme Court's discussion in Robert's Hawaii School Bus noted above that the meaning of the word "unfair" relates to harm to competition. See 91 Haw. at 255 n.34, 982 P.2d at 884. Although neither Whitey's Boat Cruises nor Robert's Hawaii School Bus go so far as to say that wrongful conduct sufficient to constitute unfair competition must be independently actionable by the plaintiff, both suggest that where an unfair competition claim is based on illegality, the reason why the conduct is illegal must relate to competition.

To the extent that HLF's unfair competition claim is based on illegality, the Court concludes that EMTALA was not promulgated "with the objective of protecting business interests or competition," Whitey's Boat Cruises, 110 Haw. at 312, 132 P.3d at 1223, but rather because "Congress was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1255 (9th Cir.

1995) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1985)).

"Congress enacted EMTALA to create a new cause of action, generally unavailable under state tort law, for what amounts to 'failure to treat'...." Bryant v. Adventist Health Sys./W., 289 F.3d 1162, 1168 (9th Cir. 2002). HLF has not asserted, nor has the Court found any authority to suggest, that in enacting EMTALA Congress was at all concerned with business interests or competition.[12] To allow HLF to bring an unfair competition claim based on the purported *illegality* of KFHP's conduct would expand Hawaii's unfair competition law beyond what the Hawaii Supreme Court has indicated it would allow.[13]

---

[12] The parties have not discussed whether Congress was concerned with business interests or competition in enacting the ACA. However, the Court notes that, like EMTALA, the seemingly applicable regulations for the ACA appear to limit causes of action for a violation of the preauthorization requirement to those brought by the Secretary of Labor or plan participants or beneficiaries and do not allow business competitors more broadly to bring claims. See 29 U.S.C. §§ 1132, 1134. The Court's holdings regarding EMTALA would thus appear to apply to the ACA as well. However, as the parties have not briefed this issue or any implications for standing, and given the Court's other holdings on this claim, the Court declines to address this further.

[13] If Hawaii were, like California, to borrow violations of other laws, then it would allow HLF to assert a cause of action based on EMTALA despite not being a patient. However, as KFHP asserts, the cause of action would be against hospitals, not against health plans like KFHP. See 42 U.S.C. § 1395dd(d)(2)(A) (providing for a "civil action against the participating hospital"); see also Jackson v. E. Bay Hosp. 246 F.3d 1248, 1260 n.6 (9th Cir. 2001) ("EMTALA only applies to hospitals which choose to participate in Medicare."); Eberhardt, 62 F.3d at 1257 ("EMTALA does not allow private suits against physicians."). (Continued...)

HLF also appears to argue instead, or in addition, that KFHP's conduct is unfair because it is contrary to the public policy established in EMTALA "of putting the patients' medical needs before the insurance companies' financial goals." Opp. at 11. However, it is not apparent from the FACC that there is a plausible basis to believe that the medical needs of any patients have been affected by KFHP's conduct. Although HLF alleges that it has lost revenue and profit from the transport of patients who would have been placed on HLF aircraft but for KFHP's conduct, FACC ¶¶ 192-96, nowhere in the FACC does HLF allege that the use of a different transportation service harmed the medical needs of those patients, or even that in making this choice, the physicians disregarded the medical needs of patients or differential transport risk from choosing HLF's competitor.[14]

Indeed, HLF has specifically alleged that "KFHP does not know whether, for example, any patient has suffered adverse medical consequences as a result of delay engendered by [KFHP's

_____

Allowing a claim against KFHP would go well beyond even California's borrowing statute, as it would expand not only the category of persons who could bring claims for violations of other laws, but also the category of persons who may be held to have violated those laws. The Court is unwilling to read HRS § 480-2 so broadly in the absence of more explicit authority.

[14] Although HLF has alleged that prior to KFHP's pre-authorization requirement, physicians generally chose HLF over its competitor, FACC ¶ 187, HLF has not plausibly alleged that choosing its competitor resulted in increased risks of or actual harm to patients.

Hospital Operation's Center]'s preauthorization process." Id. ¶
184.  KFHP's alleged ignorance, however, does not excuse HLF
from its pleading burden.  At most, HLF has alleged as a general
matter that patient health can quickly deteriorate in emergency
situations and that by maintaining more aircraft closer to
hospitals, HLF "best serve[s] patients' medical interests by
minimizing the risk to the patient being transferred." Id. ¶¶
183, 186, 187.  These allegations do not provide the Court with
a plausible basis to conclude that any violation of EMTALA that
actually occurred here posed a risk to patient health.[15]  And
while reading the FACC to allege a technical violation of EMTALA
where AMR was chosen over HLF, the Court nevertheless still has
difficulty finding that such a violation is contrary to public
policy in the absence of allegations regarding harm to patient
health.  Cf. Riopta v. Amresco Residential Mortg. Corp., 101 F.
Supp. 2d 1326, 1334 (D. Haw. 1999) (Kay, J.) (finding that
technical TILA violation did not offend established public
policy as HRS § 480-2 is not a strict liability statute and
focuses on the "reprehensibility of defendant's conduct").

---

[15] HLF asserted at the hearing that it would need to reach
discovery in order to know whether there was injury to patients.
However, whether or not discovery will support allegations does
not absolve HLF of the burden to plead the existence of such
injuries; otherwise, HLF's claim risks an unwarranted fishing
expedition.

Rather, the only harm that HLF has plausibly alleged is breach of contract. See FACC ¶ 186 (alleging that KFHP's preauthorization requirement caused hospitals to breach their FCAs with HLF). However, simple breach of contract alone is not enough to support a claim for unfair competition. See Kapunakea Partners v. Equilon Enterprises LLC, 679 F. Supp. 2d 1203, 1211 (D. Haw. 2009) (Kay, J.) (distinguishing between a potentially unconscionable penalty clause, enforcement of which could give rise to a viable unfair competition claim as it may be immoral or injurious to consumers or other competitors, and "normal breach of contract," which the Court indicated was insufficient to sustain an unfair competition claim. Accordingly, HLF has failed to allege that KFHP's conduct was unfair.

B. **Whether HLF Has Failed to Allege Injury to Competition**

KFHP also asserts that HLF has failed to plead injury to competition. Motion at 11-13. To show injury to competition, HLF must allege "*how* the [defendant's] conduct will negatively affect competition." Gurrobat v. HTH Corp., 133 Haw. 1, 22, 323 P.3d 792, 813 (2014) (emphasis added) (finding that the defendant's unlawful withholding of a service charge negatively affected competition by allowing it to charge lower base prices than its law-abiding competitors); see also Villon v. Marriott Hotel Servs., Inc., 130 Haw. 130, 150, 306 P.3d 175, 195 (2013) ("[A] plaintiff must demonstrate that its injury

stems from the negative effect on competition caused by [a defendant's] violation to ensure that it does not stem from some pro-competitive or neutral effect of the defendant's antitrust violation.") (internal quotation and citation omitted).  This requirement "is designed to serve the same purpose as the federal requirement that a plaintiff assert an antitrust injury."  Wadsworth v. KSL Grand Wailea Resort, Inc., 818 F. Supp. 2d 1240, 1265 (D. Haw. 2010) (Kay, J.) (interpreting Davis v. Four Seasons Hotel Ltd., 122 Haw. 423, 446, 228 P.3d 303, 326 (2010).  Under this standard, "[i]t is not enough to allege harm to a competitor...[p]laintiff[] must allege a harm to competition."  Id.

HLF has argued that it has sufficiently alleged injury to competition by asserting that:

> KFHP's use of its economic power in order to force hospitals to utilize the inferior services offered by HLF's competitor, even in emergency situations, and despite the fact that HLF can provide a faster service, suppresses HLF's ability to compete, and harms competition, by allowing HLF's competitor to achieve a volume of transports that it would not be able to achieve without KFHP's market interference.

FACC ¶ 188; see also id. ¶ 189 (KFHP's conduct "renders it unnecessary for HLF's competitor to undertake the investment that it would otherwise need to make to be able to compete with HLF – it has no incentive to place competing aircraft on

neighbor islands, or to otherwise try to provide a faster, better service than HLF....").

Under the analogous Sherman Act, the Ninth Circuit has clearly stated that "[o]rdinarily, the factual support needed to show injury to competition must include proof of the relevant geographic markets and demonstration of the restraint's anticompetitive effects within those markets." Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 508 (9th Cir. 1989) (affirming dismissal for failure to allege actual detrimental competitive effects). "Avoiding such market analysis requires proof of actual detrimental competitive effects such as output decreases or price increases." Id. "[R]emoval of one or a few competitors need not equate with injury to competition," as "'[e]very agreement concerning trade, every regulation of trade, restrains.'" Id. at 508 (quoting Bd. of Trade v. United States, 246 U.S. 231, 238 (1918)). Injury to competition is only threatened when the "arrangement affecting trade becomes unreasonably disruptive of market functions such as price setting, resource allocation, market entry, or output designation." See id.

At the same time, "convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants are few." Id. at 508-09. However, a plaintiff may

not "merely alleg[e] a bare legal conclusion; if the facts do not at least outline or adumbrate a violation of the Sherman Act, the plaintiffs will get nowhere merely by dressing them up in the language of antitrust." Rutman v. Wine Co. v. E.&J. Gallo Winery, 829 F.2d 729, 736 (9th Cir. 1987) (internal quotation marks and citation omitted).

Though not entirely clearly alleged in the FACC, the relevant market here appears to be "air medical transport service" in Hawaii, which KFHP does not appear to contest. See FACC ¶¶ 186-87; Motion at 12-13 (disputing its economic power in, but not the definition of, the market for "medical air transport"). HLF has alleged that it has only one competitor. FACC ¶ 187. As such, the market appears to be narrow and raises the possibility that injury to HLF could converge with injury to competition. See Les Shockley Racing, 884 F.2d at 508.

Where HLF's FACC falls short are allegations supporting "the restraint's anticompetitive effects," such as "output decreases or price increases." Id. While HLF has alleged in a conclusory manner that KFHP's conduct has resulted in anticompetitive effects, see FACC ¶¶ 188, 191, it has not provided sufficient factual allegations supporting how the injuries it has suffered are anticompetitive or how consumers have been harmed, much less how KFHP's conduct led to those effects. The FACC contains no allegations that the volume of

flights overall has decreased or that the price charged to patients (or their insurer) has increased in the market as a whole; indeed, AMR appears to charge less for its services than HLF.[16]  See FACC ¶ 185.  And HLF's allegations about the market are too threadbare to understand the effect of KFHP's alleged conduct on the market as a whole.  See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329 (1961) (explaining that, to assess injury to competition, courts should take into account "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition").

Such allegations about the market are critical for concluding that injury to HLF converges with injury to the market.  In concluding that injury to competitors[17] and to the

---

[16] "[L]ower prices, so long as they are not predatory, actually benefit competition, as opposed to harming it."  Wadsworth, 818 F. Supp. 2d at 1267.  HLF has not suggested a predatory pricing scheme exists, nor does one seem plausible here, especially given the absence of allegations that KFHP has substantial market power, which are critical for a predatory competitor to recoup its losses.  See Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995); FACC ¶ 188; see also infra at 33-35 (discussing allegations regarding economic power).

[17] The Court notes that, contrary to KFHP's implication, Motion at 13, it appears that under Hawaii law HLF does not have to allege that KFHP competes with HLF.  See HMA, 113 Haw. at 110, (Continued...)

market could converge, the Ninth Circuit in Les Shockley relied

on Oltz v. St. Peter's Community Hospital, 861, F.2d 1440 (9th

Cir. 1988) in which the court found injury to competition where

the exclusion of a single anesthetist reduced the number of

competing anesthesia providers from five to four.  884 F.2d at

509 (describing Oltz).  And in Blue Sky Color of Imagination,

LLC v. Mead Westvaco Corp., the court found antitrust injury

where the defendant entered into a series of exclusive

contracts.  No. CV 10-02175 DDP, 2010 WL 4366849, at *3 (C.D.

Cal. Sept. 23, 2010).  There the market allegedly only had four

participants and the relevant market consisted of only three

stores, so the "exclusionary domination of even a single

superstore could have an injurious effect on the market."  Id.

    The Hawaii Supreme Court also recognized in HMA the

importance of factual allegations describing the market in

sufficiently alleging injury to competition and emphasized the

plaintiffs' allegations that the defendant dominated the

healthcare enrollment market, was the largest provider of fee-

_____

148 P.3d at 1212 (holding that "plaintiffs need not be
competitors of [the defendant]" nor need they be "in
competition" with the defendant).  This appears to differ with
federal antitrust law, which requires that the parties compete
in the same market.  See Amarel v. Connell, 102 F.3d 1494, 1508
(9th Cir. 1996) as amended (Jan. 15, 1997).  However, even under
Hawaii law, the plaintiff must still sufficiently allege the
nature of competition.  HMA, 113 Haw. at 111-12, 148 P.3d at
1213-14.

for-service insurance in the state, and over 90% of physicians participated with defendant's plan.[18] <u>HMA</u>, 113 Haw. at 112, 139 P.3d at 1214. The plaintiffs also alleged that it was through such market dominance that the defendant was able to set the terms and reimbursement amounts that the plaintiffs would receive. <u>Id.</u>; <u>see also</u> <u>Wadsworth</u>, 818 F. Supp. 2d at 1268 (reading <u>HMA</u> as stating that "the plaintiffs had clearly specified the market, as well as a harm to the market and competition in the form of increased prices because of the defendant's behavior.").[19] The specific allegations regarding the defendant's dominant position in the market in <u>HMA</u> rendered it plausible – not merely possible – that the defendant could

---

[18] Indeed, in supporting its conclusions, the Hawaii Supreme Court quoted and emphasized the following factual allegations, among others: "[The defendant] dominates the enrollee market in Hawaii with over 65% of Hawaii's population enrolled in one of HMSA's plans. In this regard, HMSA is the largest provider of fee-for-service insurance in the State with more than 90% of the market and is the second largest HMO provider in the State. Similarly, [the defendant] dominates the physician market, with approximately 90% of Hawaii's physicians participating in HMSA's networks." <u>HMA</u>, 113 Haw. at 112, 148 P.3d at 1214 (emphasis omitted).
[19] As <u>Wadsworth</u> post-dates both <u>Twombly</u> and <u>Iqbal</u>, the discussion of <u>HMA</u> in <u>Wadsworth</u> reaffirms the reasoning of the Hawaii Supreme Court in finding the <u>HMA</u> pleading sufficient even in light of the stricter pleading standards of <u>Twombly</u> and <u>Iqbal</u>, contrary to what KFHP suggests. <u>See</u> Reply at 5.

act anticompetitively in setting terms and reimbursement amounts.[20]

Here, HLF's assertions that KFHP managed to force hospitals to use AMR instead of HLF, FACC ¶ 188, are still insufficient to plausibly support that injury to HLF converged with an anticompetitive effect on the market. While the number of competitors in the market is small, it is unknown from the face of the FACC how many hospitals are at issue or approximately what proportion of air ambulance flights have allegedly been affected. And though KFHP's arrangement might have injured HLF by redirecting flights it otherwise would have been assigned, the FACC does not plausibly suggest that KFHP and AMR have "exclusionary domin[ance]" in the market or that the loss in profit threatens to drive HLF from the market sufficient to cause injury to competition itself.[21] Cf. Lai v. USB-Implementers Forum, Inc., 2015 WL 12746705, at *7 (C.D. Cal. Mar. 11, 2015) ("Given the enormity of the market in which Plaintiff competes, the allegations once more fail to show that

---

[20] HLF's allegations that KFHP plausibly could achieve this result are also suspect, as discussed infra at 34-35.
[21] Indeed, KFHP asserted at the hearing that HLF has FCAs with other healthcare providers like HMSA. ECF No. 101 at 11 (Tr. of H'ring). Although such information is not currently before the Court, and is thus not properly considered, that type of information would be relevant for understanding how the flights at issue relate to the market for air ambulance services in Hawaii and the corresponding impact on HLF and on the market as a whole.

overall competitive conditions have been affected by the failure to certify one product manufactured by a single competitor."); Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 491 F. Supp. 1199, 1219 (D. Haw. 1980) ("[I]n a rule of reason case, injury to competition is determined by reference to a particular market, and by reference to that market shares held by the alleged conspirators.").

Contrasting the allegations supporting the HMA court's findings with the allegations in HLF's FACC only further supports this Court's conclusion. The FACC here alleges that KFHP used its economic power, FACC ¶¶ 188, 191, but it is missing factual allegations describing the market and how much market power KFHP has like those specifically relied on in HMA. Thus HLF's conclusory allegations about AMR being able to achieve a volume of transports it would not otherwise have without undertaking additional investment, FACC ¶¶ 188-89, which if plausible might constitute antitrust injury, do not rise above a mere possibility here because of the lack of allegations supporting how KFHP's conduct resulted in these alleged anticompetitive effects.

But even setting aside the absent allegations regarding the effect on the market, the FACC does not plausibly allege how KFHP caused the hospitals to agree to its pre-authorization requirement; it only supports that hospitals now

call AMR instead of HLF. See FACC ¶¶ 21, 187. Although HLF has

alleged that KFHP "use[d] its economic power" to get hospitals

to accede, FACC ¶ 188, HLF has not plausibly alleged that KFHP

has any market power in the first place, much less a

sufficiently dominant market position to force the hospitals to

accede. Under such circumstances, hospitals may have had other

independent or non-anticompetitive reasons to switch to AMR.

Indeed, hospitals may have chosen AMR because of the obligations

formed under contracts agreeing to "notify Kaiser" when a member

presented at an HHSC facility, "cooperate with Kaiser" in

transporting patients, and "provide services in the most

effective manner."[22] ECF No. 74-2 (March 19, 2015 letter). The

FACC thus "stops short of the line between possibility and

plausibility of entitlement to relief." Iqbal, 556 U.S. at 678.

Finally, HLF has suggested that KFHP's conduct has led

to a diminished quality of air transport services because AMR's

service requires patients to wait longer before being

---

[22] Although HLF indicated at the hearing that the hospitals
acceded because KFHP threatened them with breach of contract
lawsuits, HLF has not suggested that such lawsuits were
meritless. To the contrary, the March 19 letter suggests that
KFHP was attempting to enforce existing contracts in non-
emergency transports, which undermines the plausibility of HLF's
allegations that KFHP's pre-authorization requirement was
anticompetitive. Moreover, as KFHP notes, hospitals can face
severe penalties for violating EMTALA. See Reply at 4, and the
March 19 letter supports that doctors, like Dr. McDowell, strive
to abide by EMTALA in circumstances where they believe it
applies.

transported.  See FACC ¶ 187.  Hawaii courts have indicated that
one way to show harm to the market is by showing how consumers
have been affected by the complained-of conduct.  See Gurrobat,
133 Haw. at 30, 323 P.3d at 821 (interpreting the critical fact
in in HMA to be allegations "that the defendants' actions would
harm *patients*, i.e. the "consumers" of healthcare.") (emphasis
in original); see also Rebel Oil Co., Inc. v. Atl. Richfield
Co., 51 F.3d 1421, 1433 (9th Cir. 1995) (an act can be
anticompetitive where it results in diminished quality where
economic resources are not allocated to their best use because
consumer welfare will not be maximized).

        The factual allegations on which HLF appears to rely
for a theory of consumer harm are that HLF's air ambulance
services "best serve patients' medical interests by minimizing
the risk of harm," in emergency situations, FACC ¶ 186; that
prior to KFHP's pre-authorization requirement "HLF was generally
the first choice of physicians and hospitals for emergency
transports," id. ¶ 187, and that AMR's services are "inferior,"
id. ¶ 188.  However, these allegations do not plausibly support
that patients have been harmed.  As the Court has already noted,
there are no allegations of actual injury to patients.  Nor does
HLF allege that the quality of AMR's service is substandard or
unreasonable; it simply alleges that it is not exactly the same
as HLF's service.

HLF's theory is premised on the assumption that injury to consumers will result unless hospitals choose the highest quality of medical care available. This appears to be why HLF cites to the agency interpretive guidelines for EMTALA: HLF seeks to imply that consumers are entitled to the highest quality of service available in order to "minimize the risk to the individual who is being transferred" <u>see</u> FACC ¶ 181. However, EMTALA only provides that patients are entitled to "appropriate transfer" that "is effected through qualified personnel and transportation equipment." 42 U.S.C. § 1395dd(c)(2). This contrasts with the duties of the transferring hospital to provide medical care before transport in order to minimize risks.

Courts interpreting the "appropriate transfer" provision have held that it only requires "personnel and transportation equipment that a reasonable physician would consider appropriate to safely transport the patient in question." <u>Burditt v. U.S. Dep't of Health and Human Servs.</u>, 934 F.2d 1362, 1372-73 (5th Cir. 1991) (reading EMTALA's legislative history as indicating transfer was to be made by "proper personnel using equipment that meets health and safety standards"); <u>see also</u> <u>Lopes v. Kapiolani Med. Ctr. For Women & Children</u>, 410 F. Supp. 2d 939, 950 (D. Haw. 2005) (Kay, J.) (quoting this proposition from <u>Burditt</u> ). Since HLF has not

alleged that AMR was not a reasonable choice of air transport provider, nor has it alleged actual harm to patients, the FACC does not plausibly allege harm to consumers.[23]

Nor does the FACC plausibly suggest that consumer choice has been diminished as a result of KFHP's conduct. HLF relies on its allegations that hospitals generally chose HLF before prior to KFHP's conduct to imply that hospitals were choosing HLF over AMR. However, the FACC does not contain allegations supporting that AMR was competing with HLF in the air ambulance market in Hawaii during this time frame. Without such allegations, the inference that patients, i.e. the consumers of healthcare, are not receiving the service the hospitals would have otherwise selected, is not plausible. The FACC leaves open that HLF is merely losing market share to a new entrant in the market, which does not, by itself, indicate that the entry was anticompetitive and may actually suggest increased

_____

[23] Moreover, to the extent that an increased level of patient risk is relevant, HLF has only alleged the possibility that choosing the competitor service might increase the risk because the transport might take longer. See FACC ¶¶ 2 ("In situations where minutes can mean the difference between life and death, a patient's life may literally depend on the ability of an air ambulance to respond to a situation immediately."); 187 (HLF has three times as many aircraft as its competitor); 188-89 (HLF provides faster, better service than its competitor). However, HLF has not alleged facts plausibly indicating that lower quality of service matters in the flights at issue.

choice in the market.[24] <u>Pool Water Prods. V. Olin Corp.</u>, 258

F.3d 1024, 1036 (9th Cir. 2001) (finding no antitrust injury

where because "[a] decrease in one competitor's market share

affects competitors, not competition."); <u>Streamcast Networks,</u>

<u>Inc. v. Skype Techs., S.A.</u>, 547 F. Supp. 2d 1086 (C.D. Cal.

2007) (finding antitrust injury was insufficiently alleged where

pleading suggested conduct served to improve consumer choice).

     In light of all of the issues discussed above, the

court finds that HLF's allegations regarding injury to

competition are insufficient.  <u>See</u> <u>Prime Healthcare Servs., Inc.</u>

<u>v. Serv. Employees Int'l Union</u>, 642 F. App'x 665, 666–67 (9th

Cir.), <u>cert. denied,</u> 136 S. Ct. 2532 (2016) (finding allegations

of harm to competition conclusory where the plaintiff did not

allege that the defendant actually caused higher prices or

reduction in overall choice or quality of care).[25]  Accordingly,

---

[24] Indeed, the market may now offer a choice between two
medically appropriate service providers competing on both
quality and price: HLF, which offers an allegedly higher-quality
(that is, potentially quicker) but higher-priced ambulance
service, and AMR, which offers an allegedly lower-quality (i.e.,
potentially slower) but also lower-priced service.  The shift in
the market alleged in HLF's FACC may simply reflect a preference
for the latter option, finding it represents a better overall
value.  Agreements made by insurers, hospitals, and service
providers, such as those referred to in the March 19, 2015
letter may represent such a balance between patients' interests
in the promptness of service and price.
[25] The Court notes that EMTALA may complicate the interplay of
competitive forces in the air ambulance market in Hawaii.  While
HLF has correctly alleged that EMTALA delegates the authority to
(Continued...)

the Court concludes that HLF has failed to plausibly state a claim for unfair competition under HRS § 480-2.  The Court GRANTS KFHP's Motion as to Count I and DISMISSES HLF's unfair competition claim.

## II.  Count II: Intentional Interference with Contract Claim

Under Hawaii law, the elements of tortious interference with contractual relations are: "(1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract; (4) the absence of justification on the defendant's part; (5) the subsequent breach of the contract by the third party; and (6) damages to the plaintiff."  Meridian Mortg., Inc. v. First Haw. Bank, 109 Haw. 35, 44, 122 P.3d 1133, 1142 (2005) (emphasis omitted) (citing Weinberg v. Mauch, 78 Haw. 40, 890 P.2d 277 (1995)); also Queen's Med. Ctr. v. Kaiser Found. Health Plan, Inc., 948 F. Supp. 2d 1131 (D. Haw. 2013) (Kay, J.) (quoting

---

choose the transport service used to the treating physician, FACC ¶ 22; EMTALA does not appear to address the issue that it is the insurer of unstabilized patients, not the treating physicians, who bears the cost of emergency flights.  The Court notes that HLF has asserted that it should be allowed to charge, in the case of an unstabilized patient, a rate set only "by market and competitive forces."  Sidlo, HLF's Limited Response to Factual Assertions Made By KFHP, ECF No. 355-2 at 5 n.3.  In any event, it remains HLF's duty to sufficiently allege injury to competition if it wishes to bring a claim for unfair competition.

Meridian Mortg.).  KFHP has moved to dismiss HLF's intentional

interference with contract claim on the basis that HLF has

failed to sufficiently allege intentional inducement and that

HLF admits that KFHP's actions were justified.  Motion at 14-15.

### A. Whether KFHP Intentionally Induced Hospitals to Breach Their FCAs

In Hawaii, "[t]he third element – intent – 'denotes

purposefully improper interference,' and 'requires a state of

mind or motive more culpable than mere intent.'"  HMA, 113 Haw.

at 116, 148 P.3d at 1218 (quoting Omega Envtl., Inc. v.

Gilbarco, 127 F.3d 1157, 1166 (9th Cir. 1997) and Locricchio v.

Legal Servs. Corp., 833 F.2d 1352, 1358 (9th Cir. 1987),

respectively).  In other words,

> '[t]he plaintiff must prove that the
> defendant either pursued an improper
> objective of harming the plaintiff or used
> wrongful means that caused injury in fact.
> Asserting one's rights to maximize economic
> interests does not create an interference of
> ill will or improper purpose.'

Id. (quoting Omega Envtl., 127 F.3d at 1166).  The alleged

wrongful actions must go beyond mere breach of contract in order

to state a tortious interference claim.  See Meridian Mortg.,

109 Haw. at 47, 122 P.3d at 1145 ("Evidence merely of a breached

contract was insufficient to sustain a tortious interference

with contractual relations claim."); Kapunakea Partners, 679 F.

Supp. 2d at 1220 (finding plaintiff sufficiently stated a

- 41 -

tortious interference claim because enforcement of alleged penalty provisions constituted unfair competition and thus "transcend[ed] the breach of the Agreements").  HLF has asserted that the FACC sufficiently alleged that KFHP both used "wrongful means" and had an improper intent.  Opp. at 16-17.

First, HLF has asserted that "KFHP's conduct was designed to disrupt HLF's business operations and relationships with Patients and hospitals."  FACC ¶ 192.  This allegation is insufficient as it amounts to a "'formulaic recitation'" of the element that KFHP intended to interfere.  See Wadsworth, 818 F. Supp. 2d at 1246 (quoting Bell Atl. Corp., 550 U.S. at 555).

Next, HLF has argued that in causing hospitals to violate EMTALA, KFHP violated public policy.  Opp. at 17-18.  As discussed above, HLF has not plausibly asserted that KFHP violated the public policy established in EMTALA, and accordingly cannot claim that KFHP's conduct was improper on that basis.

HLF has additionally alleged that KFHP requires pre-authorization, regardless of whether there is an emergency, which violates EMTALA.  FACC ¶ 26.  The Restatement (Second) of Torts suggests that "[c]onduct specifically in violation of statutory provisions" may make an interference improper.  Restatement (Second) of Torts § 767; see also Wadsworth, 2014 WL 6065875, at *12 ("An improper means may be demonstrated where

the interference involved 'violations of statutes, regulations, or recognized common-law rules.'") (quoting Kutcher, 957 P.2d at 1089). However, accepting as true HLF's allegations that KFHP demanded that hospitals obtain pre-authorization for patients in an unstable condition, which might constitute an EMTALA violation, it would still be the hospitals, not KFHP, who committed such violation. HLF cannot ground KFHP's alleged interference with contract on the hospitals' supposed violations of EMTALA without additional allegations that KFHP acted wrongfully in causing the hospitals to violate EMTALA. As discussed above, it is only possible, not plausible, that KFHP improperly used its market power to enforce its pre-authorization requirement for hospitals.

However, the fact that the FACC does not plausibly allege anticompetitive *effect* does not necessarily preclude allegations that KFHP's conduct demonstrates improper or anticompetitive *intent*. See FACC ¶¶ 192, 204; Opp. at 17 (alleging that KFHP was "motivated by...anticompetitive considerations" and that its conduct was designed "to impede or destroy HLF's ability to compete").

In HMA, the Hawaii Supreme Court found sufficient allegations of intent where the defendant's automatic and improper downcoding of claims and improper editing claims which resulted in denials of reimbursement "caused injury and

disrupted relationships with patients". <u>HMA,</u> 113 Haw. at 118, 148 P.3d at 1220. Similarly, in <u>Hawaii Motorsports Investment, Inc,. v. Clayton Group Services</u>, the court found intent sufficiently alleged where the defendant had "intentionally and/or negligently represented the status of the property" at issue. Civ. No. 09-304 SOM-BMK, 2009 WL 3109941, at *7 (D. Haw. Sept. 25, 2009).

By contrast, in <u>Gold Refinery, LLC v. Aloha Island Gold, LLC</u> found allegations that the counter-defendant "through its unlawful threats and prosecution of legal action, did purposefully interfere with business relations between [Aloha Island] and [its customers] and their expectancy of future economic benefit to be derived from such relationship" insufficient to establish intent. No. CIV. 11-00522 SOM, 2012 WL 518396, at *11 (D. Haw. Feb. 15, 2012). The court specifically noted that the complaint was conclusory, despite claiming that the threats and lawsuit were "unlawful" because it "provide[d] no explanation of what made the threats or lawsuit improper." <u>Id.</u>

The distinction between <u>Gold Refinery</u> on one hand and <u>HMA</u> and <u>Hawaii Motorsports</u> on the other is critical. Those cases demonstrate that the plaintiff must provide a plausible theory or explanation as to how the conduct at issue shows unlawful or improper intent, rather than merely asserting that

an act is unlawful or illegal without supporting factual allegations. However, the only conduct alleged underlying the FACC is that KFHP required that hospitals obtain pre-authorization from Kaiser. See FACC ¶ 183. This conduct could be consistent with anticompetitive intent, if, as HLF suggested at the hearing, KFHP *improperly* threatened HHSC with breach of contract. ECF No. 106 at 28-29 (Tr. of H'ring); see Kutcher, 87 Haw. at 405, 957 P.2d at 1087 (improper means may include unfounded litigation). However, HLF has not alleged that the threats were unfounded, and the letter to which HLF was referring suggests the opposite. ECF No. 74-2. Especially in view of this letter, HLF must do more to explain that KFHP lacked a basis for enforcing the pre-authorization requirement or how the requirement demonstrates intent to harm HLF rather than rational pursuit of KFHP's hospital operations and economic goals.

The FACC's suggestion that KFHP acted in pursuit of lower costs, FACC ¶ 185, which is reinforced by the March 19, 2015 letter requiring that HHSC notify and cooperate with Kaiser and provide services in the most cost effective manner, also distinguishes this case from Peace Software, Inc. v. Hawaii. Electric Co., No. CIV 09-00408 SOM/LEK, 2010 WL 290649, at *7 (D. Haw. Jan. 22, 2010). There, the court found improper intent despite allegations "suggest[ing] that [the defendant] was

attempting to maximize its own economic interest.  Id.  In doing

so, the court was able to rely on allegations that the defendant

had "apparent control" over the party breaching the contract and

interfered after it no longer had an economic interest in the

contract, and thus its motivation was at least "unclear."  Id.

As the court in Gold Refinery later noted, the court was able to

infer an improper objective from the lack of economic benefit

from interfering with the contract.  2012 WL 518396, at *10.

Because the FACC suggests that KFHP was motivated at least in

part in order to obtain lower costs, see FACC ¶ 93, the FACC

does not plausibly suggest that KFHP was not simply motivated by

economic gain.

        The Court is mindful that it is considering a motion

to dismiss, and not summary judgment, and thus it "is not

deciding whether a claimant will ultimately prevail but rather

whether the claimant is entitled to offer evidence to support

the claims asserted."  Tedder, 863 F. Supp. 2d at 1030 (D. Haw.

2012).  However, this does not relieve HLF of the burden of

providing a plausible theory or explanation of how KFHP's

conduct is wrongful or demonstrates improper intent.  Such

allegations are critical to define the scope of what evidence

HLF will pursue and offer in support of the FACC, rather than

allowing HLF to conduct a fishing expedition.  The FACC's

conclusory allegations of improper intent here simply fall short

of nudging the asserted impropriety of KFHP's conduct across the line of plausibility. Accordingly, the FACC fails to state the intent element of HLF's tortious interference with contract claim.

## B. Whether KFHP's Actions Were Not Justified

KFHP also asserts that HLF's allegations regarding its alleged lack of justification are conclusory and that HLF has admitted KFHP's conduct was justified. Motion at 16-17. "The fourth element, that the defendant acted without proper justification, must be a part of the plaintiff's prima facie case." Kutcher v. Zimmerman, 87 Haw. 394, 406, 957 P.2d 1076, 1088 (Haw. Ct. App. 1998). "[A] plaintiff may show that interference was without proper justification where the interference was 'tortious, illegal, or unconstitutional' and/or involved 'violations of statutes, regulations or recognized common-law rules.'" Id. at 407 (quoting Prosser & Keeton on the Law of Torts § 129, at 982).

Beyond that, Hawaii courts have indicated they are "reluctant to specify and thus limit what may constitute unjustified interference under all circumstances" and instead appear to defer to caselaw. Id. Compliance with statutes does not preclude a finding of lack of justification. See Rossi v. Motion Pictures Ass'n of Am. Inc., 391 F.3d 1000, 1006 n.10 (9th Cir. 2004) (interpreting Hawaii law). Motivation solely for

personal gain has been held to constitute a lack of justification.  See Lee v. Aiu, 85 Haw. 19, 32, 939 P.3d 655, 668 (1997) (relying on the fact that defendants entered into the same agreement that they encouraged the plaintiffs to breach).

Hawaii has indicated that the issue of justification turns on whether the contractual interests at stake outweigh the value of the allegedly interfering conduct or not; if so, the conduct may be found unjustified and liability may be imposed, if the other elements are met.  Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Haw. 251, 269–70, 151 P.3d 732, 750–51 (2007) ("The question of justification therefore rests on whether protection of the contractual interests merits prohibition of the particular conduct which interferes with that interest.").  The defendant may be privileged to induce a breach where it "acts to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved."  Id.  However, Hawaii does not require a plaintiff to negate privilege and other defenses in pleading that the defendant acted without justification.  Kutcher, 87 Haw. at 408, 957 P.2d at 1090.

Here, HLF has alleged that "KFHP was not justified in its conduct of requiring preauthorization and inducing the hospitals to breach their FCA contracts with HLF because, among other things, KFHP's conduct violates federal law."  FACC ¶ 203.

KFHP construes these allegations as referring to a violation of EMTALA. Motion at 16. In order for HLF to rely on an EMTALA violation to show lack of justification, it must show that the violation has a connection to commercial or business interests. In Whitey's Boat Cruises, the Hawaii Supreme Court determined that for an interference with prospective business advantage claim, the statutes violated "must have some nexus to commercial business interests" or provide "private rights and remedies." 110 Haw. at 317 n.25, 132 P.3d at 1228 (as described in Kutcher, 87 Haw. at 405-06, 957 P.2d at 1087-88, both interference with existing and prospective contractual relations require a lack of justification). The court then concluded that the plaintiff's reliance on violations of environmental regulations was insufficient. Id. For the reasons discussed above, the Court finds that allegations regarding EMTALA are not sufficient to allege lack of justification as they do not have a nexus to commercial interests or provide a private right to HLF against KFHP.

To the extent HLF also alleges that KFHP's conduct was not justified because it had an anticompetitive motive such allegations are not plausible as the FACC does not indicate or explain how KFHP's conduct shows anticompetitive motivation, as discussed above. See Gold Refinery, 2012 WL 518396, at *9 (allegations that defendant lacked lawful justification to

threaten legal action and that defendant's sole purpose was to induce breach held conclusory as the complaint did not indicate how the plaintiff could show these conclusions).

Finally, the Court notes that in the March 19, 2015 letter to HHSC, KFHP asserted that under the contract, HHSC agreed to "provide services in the most cost effective manner," and thus KFHP required HHSC facilities to "notify Kaiser within 48 hours" and "cooperate with Kaiser on the transfer of its members." ECF No. 74-2. Contrary to HLF's allegations that KFHP lacked justification, this letter suggests that KFHP had a justification for attempting to enforce its contract with HHSC.[26] Accordingly, the Court finds that HLF has not sufficiently stated a claim for tortious interference with contract thus GRANTS KFHP's Motion to Dismiss Count II.

### III. Count III: ERISA Claim

The Court next turns to KFHP's argument that HLF's claims for ERISA benefits pursuant to 29 U.S.C. § 1132(a)(1)(B)[27]

---

[26] Although the Court recognizes that KFHP's assertions in the letter might be contradicted or proven untrue, the fact that HLF is aware of KFHP's stated position in this letter and has failed to allege any facts which would undermine it is troubling.
[27] 29 U.S.C. § 1132(a)(1)(B) provides that a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." HLF has brought claims as the assignee of benefits, which assignment this Court previously (Continued...)

are collaterally estopped by this Court's decision in the Sidlo action, ECF No. 56.[28]  Motion at 17.

Collateral estoppel, or issue preclusion, "generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or different claim."  New Hampshire v. Maine, 532 U.S. 742, 748-49 (2001).  "Issue preclusion bars relitigation of issues adjudicated in an earlier proceeding if three requirements are met: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding."  In re Reynoso, 477 F.3d 1117, 1122 (9th Cir. 2007) (citing Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 (9th Cir. 2006).

HLF does not appear to contest that it was in privity with the plaintiff in Sidlo.  See Opp. at 21-24.  The Court agrees that this element is satisfied because HLF was able to

_____

held does not violate the anti-assignment provision of the plan. ECF No. 76 at 31.
[28] ECF No. 56 in this action was also filed as ECF No. 487 in the Sidlo action.

participate in and had a practical opportunity to control the

Sidlo litigation by virtue of its JLA with Sidlo and the

multiple joinders it filed to Sidlo's summary judgment briefing.

See In re Schimmels, 127 F.3d 875, 881 (9th Cir. 1997)

(describing relationships deemed sufficiently close to justify

finding privity, including where a nonparty had a significant

interest and participated in the prior action); United States v.

Bhatia, 545 F.3d 757, 759-60 (9th Cir. 2008) (privity may be

found where nonparty had the same practical opportunity as a

party to control the proceedings); ECF No. 45 at 3, 6, 9, 22-23.

As to the second element of collateral estoppel, there

was a final judgment entered in favor of KFHP in Sidlo v. Kaiser

Found. Health Plan, Inc., No. 1:15-cv-00269, ECF No. 526.[29]

The real dispute is regarding the last element:

whether Count III raises the same issues as in Sidlo and if

those issues were necessarily decided in this Court's previous

Order. "Collateral estoppel treats as final only those

questions actually and necessarily decided in a prior suit."

Brown v. Felsen, 442 U.S. 127, 139 n.10 (1979); see also

Syverson v. Int'l Bus. Machines Corp., 472 F.3d 1072, 1078

---

[29] As KFHP notes, the pendency of the Sidlo appeal does not
preclude the application of collateral estoppel. See Robi v.
Five Platters, Inc., 838 F.2d 318, 327 (9th Cir. 1988) ("The
present appeals in no way affect the 'firmness' of the Robi
decisions in the district court for purposes of issue
preclusion.").

(defining the elements of offensive nonmutual issue preclusion to include that "the issue was decided in a final judgment"). As both this action and Sidlo involve claims for ERISA benefits, it is unsurprising that some of the allegations underlying this claim are very similar to those in Sidlo, as shown by KFHP's comparison. Motion at 19-20. However, this Court disagrees that all of the issues essential to dispose of HLF's claim were necessarily decided by this Court's opinion in Sidlo.

In granting summary judgment to KFHP on Sidlo's ERISA claim, the Court determined that the Inter-Facility Transport Policy, rather than Section G (or the "Ambulance Services provision") governed Sidlo's claim for benefits.[30] ECF No. 56 at 51-52. KFHP represented that that policy "reimburses providers for members' transport at no cost to members, including copays...." Id. at 46. As such, the Inter-Facility Transport Policy "ask[e]d nothing of [Sidlo] from a cost standpoint." Id. at 52; see also id. at 20 (reimbursement "with no copayment obligation on Members"), 46-47 (reimbursement provided "at no

_____

[30] The Court recognizes that HLF has presented claims under Section G for preservation and to the extent that any patient was transported from the scene of an incident to a facility, rather than between facilities. Opp. at 23 n.11. Based on the FACC, the Court cannot determine whether there are any scene-to-facility transports that may be governed by Section G. However, to the extent that HLF is asserting that facility-to-facility transports are governed by Section G, the Court finds such claims to be collaterally estopped by virtue of the Sidlo decision.

cost to members, including copays" and "no copayment is required by the Inter-Facility Transport Policy"). Thus, the Court's holding that the Inter-Facility Transport Policy applied resulted in Sidlo not owing anything to KFHP.

The parties still dispute, however, whether the Court necessarily decided whether HLF may seek 100% of its billed charges from KFHP under the Inter-Facility Transport Policy. Opp. at 23-24; Reply at 14-15. HLF has alleged that under the Inter-Facility Transport Policy, "KFHP is obligated to pay 100% of all amounts owed to HLF by Assignors," FACC ¶ 216, and asserts that this Court did not determine the actual amount due to HLF in the Sidlo litigation. Opp. at 23. KFHP argues that the Court accepted that the Inter-Facility Transport policy only requires Kaiser to pay "fair market value," that KFHP had complied with the plan, and in deciding no further benefits were payable to Sidlo necessarily determined that the amount KFHP paid was at or above fair market value. Reply at 14-15.

KFHP asserted in the Sidlo litigation that under the Inter-Facility Transport Policy, "'KFHP determines the fair market value of the services'" and reimburses at that rate. ECF No. 56 at 46 (quoting KFHP's Reply at 9); see also ECF No. 56 at 20 (KFHP reimburses "at fair market value with no copayment obligation on Members."). Although the Court noted that "Sidlo's claim was reimbursed to the fullest extent anticipated

- 54 -

by the plan," ECF No. 56 at 62, the Court did not, as KFHP argues, necessarily determine that the 200% of Medicare rate KFHP used for reimbursement was at or above fair market value and that no further benefits were payable. Nor did the Court find that the proper rate for air ambulances services owed under the Inter-Facility Transport Policy was reimbursement at fair market value. Rather, the Court simply recognized that KFHP had complied with its practice of reimbursing at 200% of the Medicare rate under the Inter-Facility Transport Policy, ECF No. 56 at 21. Indeed, the Court immediately clarified this point in a footnote and explicitly stated that "an issue remains as to whether KFHP reimbursed HLF at the proper rate," as it was "an issue not currently before the Court." Id. at 62 n.14; see also id. at 65 ("it is undetermined at this point whether KFHP reimbursed HLF at the proper rate").[31]

---

[31] In addition, this Court issued a minute order on September 6, 2016 noting that the parties appeared at the time to agree that the fair market rate is the appropriate rate and directed the parties to explore with the magistrate judge whether they could use alternative dispute resolution to determine what fair market value rate was. ECF No. 38. Moreover, during the summary judgment hearing the Court indicated multiple times that it encouraged the parties to address the rate of reimbursement issue before the magistrate judge. See Sidlo, Tr. of Hearing, Sept. 15, 2016, ECF No. 421 at 16, 97. These directives belie KFHP's assertion that the Court has already determined what the proper rate of reimbursement was, and the Court additionally notes that the parties do not currently appear to agree that fair market value is the appropriate rate.

In sum, application of the Inter-Facility Transport Policy resolved Sidlo's claim because it meant that Sidlo did not owe anything further to KFHP.  However, such determination did not resolve what the proper rate of reimbursement was.  Nor did it resolve whether the 200% of Medicare rate was less than the proper reimbursement rate such that KFHP was required to provide additional reimbursement to HLF pursuant to Sidlo's benefits plan (or conversely if 200% of Medicare was greater than the proper rate of reimbursement, if HLF would have to repay a portion of KFHP's payment).  Because it has already concluded that the Inter-Facility Transport Policy applies to facility-to-facility transports, the Court GRANTS KFHP's Motion as to this issue.  However, the Court DENIES KFHP's Motion as to the rate of reimbursement (that is, the proper rate for air ambulances services) and accordingly finds that HLF is not collaterally estopped from pursuing this part of Count III.

## IV.   Count IV: Breach of Contract Claim

### A. Judicial Notice of Documents

Concurrently with its Motion to Dismiss and as relevant to its arguments for dismissing the breach of contract claim, KFHP filed a request for judicial notice, which HLF has not opposed.  Request for Judicial Notice, ECF No. 100 ("Request").  The Request seeks notice of four documents, all of

which this Court previously considered in connection with the
_Sidlo_ matter.  Request at 2.

     "When ruling on a Rule 12(b)(6) motion to dismiss, if
a district court considers evidence outside the pleadings, it
must normally convert the 12(b)(6) motion into a Rule 56 motion
for summary judgment, and it must give the nonmoving party an
opportunity to respond."  _Ritchie_, 342 F.3d at 907.  "A court
may, however, consider certain materials – documents attached to
the complaint, documents incorporated by reference in the
complaint, or matters of judicial notice – without converting
the motion to dismiss into a motion for summary judgment."  _Id._
at 908.  Under Federal Rule of Evidence 201, the Court may also
take judicial notice of "a fact that is not subject to
reasonable dispute because it (1) is generally known within the
trial court's territorial jurisdiction; or (2) can be accurately
and readily determined from sources whose accuracy cannot
reasonably be questioned."  Fed. R. Evid. 201(b).

     In addition, the Court may consider a document
referenced in the complaint if it is central to the plaintiff's
claim and no party questions the authenticity of the copy
attached to the motion.  _Marder v. Lopez_, 450 F.3d 445, 448 (9th
Cir. 2006).  A document "may be incorporated by reference into a
complaint if the plaintiff refers extensively to the document or
the document forms the basis of plaintiff's claim."  _Ritchie_,

342 F.3d at 908 (noting that "incorporation by reference may apply, for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan."). In addition, the document's authenticity must not be in dispute. Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1160 (9th Cir. 2012) ("[C]ourts may take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.") (internal quotation and alteration omitted).

The first three documents are letters from KFHP relating to its indemnification and defense promises to its members. Request, Exhibits 1-3, ECF Nos. 100-2 to 100-4. These documents appear central to HLF's breach of contract claim. See FACC ¶¶ 9 (KFHP "has offered unlimited indemnification benefits to certain KFHP members related to services received from HLF."); 169 ("KFHP has agreed to indemnify Assignors, and each of them for any amount that might be deemed due and owing to HLF."); 218 ("Under KFHP's promises to indemnify all Assignors for any amounts deemed owing to HLF, KFHP is obligated to pay 100% of all amounts owed to HLF by Assignors, and to ensure that HLF is fully compensated at no cost to Assignors, or any of them."); 225 ("KFHP has made promises, and has undertaken a contractual obligation outside of the Plans and independent of

ERISA, to pay any and all remaining amounts owed to HLF by Assignors, and each of them.").

The last document is a copy of Sidlo's signed Standard Ambulance Signature Form, which contains an assignment provision, giving HLF "all right, title, and interest in all benefit plans from which my dependents or I are entitled to recover and agree to immediately remit and assign any payment for the services provided to [HLF]." Exhibit 4, ECF No. 100-5. The contents of this document are also incorporated into HLF's claim: "The KFHP members at issue have each assigned their rights and benefits under their KFHP plans to HLF." FACC ¶ 6; see also id. ¶¶ 31-159 (alleging assignment to HLF for each Assignor). Both Counts III and IV rely on this assignment to allow HLF to bring claims in place of the Assignors. See FACC ¶¶ 220, 226.

As HLF has not disputed the authenticity of any of the documents, the Court GRANTS KFHP's Request for Judicial Notice and has considered the documents in determining the breach of contract claim.

## B. Whether HLF Has Asserted a Ripe Claim Regarding KFHP's Indemnity Promises

In its Motion to Dismiss, KFHP first asserts that the breach of contract claim is barred for ripeness, just as Sidlo's claim for equitable indemnification was, and thus is also barred

by collateral estoppel.  Motion at 22-23; ECF No. 56 at 72-77.
HLF argues in opposition that by demanding payment against the
Assignors, it has ripened claims based on KFHP's indemnification
promises to the Assignors.  Opp. at 25.  As determining ripeness
of the breach of contract claim depends in part on the substance
of the indemnity KFHP gave to the Assignors and when its duty to
indemnify arose, the Court will address ripeness together with
KFHP's arguments about the plausibility of HLF's interpretation
of the indemnity promises.  See Motion at 23-24.

### 1. Interpretation of the Indemnity Offer

KFHP appears to assert that HLF's characterization of
the indemnity promises is unambiguously wrong, and that HLF has
not alleged a breach under the offers as properly construed.
See Motion at 23-24.  HLF has not addressed the contract
interpretation issue in its Opposition, but rather appears to
assert that the indemnification contract is enforceable and that
HLF will seek to enforce it.  Opp. at 26-30.  On a motion to
dismiss, this Court may consider whether a contract is
ambiguous, and even if it is ambiguous, whether the complaint
still states a claim under the possible interpretations.  See
Hungate v. Law Office of David B. Rosen, No. SCAP-13-0005234,
2017 WL 747870, at *7 (Haw. Feb. 27, 2017) (reversing dismissal
where the court concluded that despite contract ambiguity, the

complaint stated a claim under the interpretation more favorable to the plaintiff).

In Hawaii, "an agreement should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause." Santiago v. Tanaka, 137 Haw. 137, 155, 366 P.3d 612, 630 (2016), cert. denied, 137 S. Ct. 198 (2016) (internal quotation omitted). "[C]ontractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech." State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc., 90 Haw. 315, 324, 978 P.2d 753, 762 (1999). "[C]ourts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous." Id. In determining whether an ambiguity exists, "[t]he court should look no further than the four corners of the document." Id. "Where a term or clause remains open to more than one reading, we construe any ambiguity against the party who drafted the contract." Santiago, 137 Haw. at 155, 366 P.3d at 630 (internal quotation omitted).

KFHP has made the following indemnification promises[32] to its members who received air ambulance services from HLF: (1)

---

[32] KFHP also made an offer of legal defense to its members.  See Request, Ex. 2.  However, as the offer of defense does not (Continued...)

"If you have made a payment to Hawaii Life Flight...we will reimburse you for verified payment amounts."  Request, Ex. 1; (2) "Kaiser has written all affected Members that it will defend them personally against HLF's baseless claims [and] Kaiser wishes to clarify that it will also <u>indemnify</u> all impacted Members from HLF's baseless claims (beyond the costs of their co-pays).  Request, Ex. 3 (emphasis in original).

HLF's characterization of the reimbursement promise as an agreement to pay to HLF on demand the full amounts HLF claims are owed is implausible, as the core of KFHP's promises are to "reimburse" members for payments made to HLF and to "indemnify" its members "from HLF's baseless claims."  Request, Exs. 1, 3. Although KFHP would be required to reimburse these amounts if any of the Assignors had paid HLF in full, HLF has not alleged that any reimbursement is due to Assignors.  Nor is it apparent that reimbursement necessarily will ever become due, and thus ripeness concerns are implicated.

The promise to "indemnify" its members "from HLF's baseless claims" in the third letter raises similar concerns. The duty to indemnify does not arise until liability is determined.  <u>See</u> <u>Pancakes of Haw., Inc. v. Pomare Properties Corp.</u>, 85 Haw. 286, 292, 944 P.2d 83, 89 (Haw. Ct. App. 1997)

---

appear to be at issue here, the Court will not discuss it further.

("Once the trier of fact makes a determination on the claims in the lawsuit, the duty to indemnify will either arise or lie dormant.  Claims falling within the indemnity provision will trigger the duty to indemnify, while claims falling outside the provision will relieve the indemnitor of his or her duty to indemnify.") (quoted with approval in Haole v. Hawaii, 111 Haw. 144, 151, 140 P.3d 377, 384 (2006)).  Although HLF has alleged that KFHP may be held liable for indemnification, it has not sufficiently alleged that KFHP's duty to indemnify has in fact arisen.  As such, HLF's allegations fail to state a claim and raise ripeness concerns.

2. Ripeness

"The ripeness doctrine prevents courts, through avoidance of premature adjudication, from entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties."  18 Unnamed John Smith Prisoners v. Meese, 871 F.2d 881, 883 (9th Cir. 1989).  Because ripeness is "determinative of jurisdiction," "[i]f a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed."  S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 502 (9th Cir. 1990); see also Higa v. Earp, Civ. No. 08-00411 JMS-LEK, 2009 WL 1402686, at *2 (D. Haw. May 15, 2009) ("The question of ripeness, like other challenges

to a court's subject matter jurisdiction, is treated as a motion to dismiss under Rule 12(b)(1).") (citation omitted).

"One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is *certainly impending*, that is enough."  <u>Thomas v. Union Carbide Agric. Prods. Co.</u>, 473 U.S. 568, 581 (1985) (emphasis added) (citation omitted).  But where a plaintiff's claim involves "contingent future events that may not occur as anticipated, or indeed not occur at all," the claim is not ripe for judicial review because "the issues raised require further factual development."  <u>18 Unnamed John Smith Prisoners</u>, 871 F.2d at 883 (quoting <u>Thomas</u>, 473 U.S. at 581).

As noted above, "a cause of action for indemnity does not accrue until the indemnitee has suffered a loss."  <u>Barron v. United States</u>, 654 F.2d 644, 650 (9th Cir. 1981).  This is different than the duty to defend, which is broader and arises earlier than the duty to indemnify.  <u>See</u> <u>W. World Ins. Co. v. Cty. of Hawaii</u>, No. CV0500742DAE/LEK, 2008 WL 2073494, at *2 n.1 (D. Haw. May 15, 2008), <u>aff'd,</u> 357 F. App'x 795 (9th Cir. 2009) ("the 'duty to indemnify remains speculative until the underlying proceeding against the insured has progressed sufficiently to settle the relevant liability issues.'")(quoting <u>Am. States Ins. Co. v. Dastar Corp.</u>, 318 F.3d 881, 894 (9th Cir. 2003) (Ferguson, J., dissenting) (interpreting Oregon law));

_Haole_, 111 Haw. at 151, 140 P.3d at 384 (finding the duty to defend arises when the complaint raises the potential for indemnification); _Delmonte v. State Farm Fire & Cas. Co._, 90 Haw. 39, 52, 975 P.2d 1159, 1172 (1999), _as amended_ (Mar. 15, 1999) ("The duty to defend is broader than the duty to indemnify.").

"[C]ourts often find claims for indemnification or contribution are not ripe because the claims are contingent on a finding of liability on the underlying claim." _Hecht v. Summerlin Life & Health Ins. Co._, 536 F. Supp. 2d 1236, 1241 (D. Nev. 2008) (collecting cases). In _Western World_, the court had previously found that there was a duty to defend but concluded that the indemnification issue was not ripe where there were "substantial factual disputes" remaining in the underlying state court action which would "have a direct and substantial impact on the question" of indemnification. _W. World Ins. Co._, 2008 WL 2073494, at *2. Similarly, in _Seattle Times Co. v. National Surety Corp._, the court concluded that the breach of contract claim based on an indemnification agreement was not yet ripe because the plaintiff did not "point to a distinct and unequivocal statement that [the defendant] intend[ed] not to perform under the contract when and if its performance be[came] due." No. C13-1463RSL, 2016 WL 3033498, at *3 (W.D. Wash. May 27, 2016). Rather, the defendant asserted that it did not have

sufficient information to evaluate liability and raised defenses to the plaintiff's claims, which was insufficient to constitute an anticipatory breach. Id.

The Court agrees that HLF's breach of contract claim is not yet ripe. HLF has alleged that it has requested payment from each Assignor of the unpaid amount due, but that is still insufficient to give rise to KFHP's indemnification duties. See Pancakes, 85 Haw. at 292, 944 P.2d at 89 (the duty to arise will either arise or lie dormant once the underlying claims have been determined). A breach of contract claim based on the indemnification remains contingent on various events, such as resolution of the amount Kaiser must pay under the ERISA claim, see ECF No. 56 at 62 n.14, so it remains uncertain whether a balance will remain on any of HLF's bills.

Although HLF also appears to assert that if a balance remains, it would sue to collect the balance, see Opp. at 26, this assertion does not solve the ripeness issues. There is no evidence that if the Assignors are deemed liable for the balance, KFHP will refuse to indemnify them. In addition, the parties have foreshadowed various arguments about the enforceability of the indemnification agreement based on balance billing, unconscionability, and preemption under the Airline Deregulation Act, see Motion at 24; Opp. at 26-30; Reply at 20. Resolution of those issues may affect whether the Assignors can

be held liable for the balance and thus will bear on whether KFHP's indemnification duty arises at all, much less in what amount. The Court declines to address any of these issues at this stage, but they further illustrate why the indemnification claim is not yet ripe.[33] See 18 Unnamed John Smith Prisoners, 871 F.2d at 883 (dismissing claims that involved "'contingent future events that may not occur as anticipated, indeed may not occur at all.'") (quoting Thomas, 473 U.S. at 581).

In sum, the Court finds that HLF has not stated a claim for breach of the indemnification agreement because HLF cannot yet allege that it is legally entitled to full reimbursement and the claim is not ripe. See Entercom Sacramento, LLC v. Am. Home Assur., Co., No. C 07-06493 JSW, 2008 WL 2025015, at *3 (N.D. Cal. May 8, 2008) ("Because Entercom has not yet become legally obligated to pay any such sums, any claim for breach of contract based on a refusal to acknowledge and provide coverage, i.e. to indemnify the Entercom Parties, is not yet ripe."); Aliya Medcare Fin., LLC v. Nickell, 156 F. Supp. 3d 1105, 1137 (C.D. Cal. 2015) ("It is axiomatic

---

[33] HLF argued at the hearing that it seeks to have the Court through the assignment determine the amounts to which HLF has alleged it is entitled, and the indemnity would be the means of collecting those amounts after entitlement has been proven. However, this discussion at the hearing only further reinforces the Court's conclusion that this claim is not yet ripe.

that Exec Billing has no obligation to indemnify Aliya for damages that have not yet been awarded to it.").

### C. Whether HLF Validly Received an Assignment of the Indemnity Rights and Has Standing

KFHP next asserts that HLF was never properly assigned indemnification rights and therefore lacks standing to assert a claim for breach of contract. Motion at 24-25. HLF argues in response that the assignment provisions are so broadly worded that they encompass the indemnity promises KFHP later gave to its members. Opp. at 30.

In Hawaii, "[a]ssignments are subject to the standards applicable to the interpretation of contracts." Martin v. GMAC Mortg. Corp., No. CIV. 11-00118 LEK, 2012 WL 2526911, at *2 (D. Haw. June 29, 2012). The Court has already set forth the standards for contract interpretation above. In addition, "where an assignment is challenged, the presumption is in favor of assignment." AIG Hawaii Ins. Co. v. State Farm Ins. Companies, 119 Haw. 244, 195 P.3d 711 (Haw. Ct. App. 2008) (unpublished) (internal citation and quotation omitted).

In Hawaii, an assignment generally "operates to place the assignee in the shoes of the assignor, and provides the assignee with *the same legal rights as the assignor* had before assignment." Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co., 109 Haw. 343, 349, 126 P.3d 386, 392 (2006) (emphasis in

original) (internal quotation marks omitted). Here, HLF obtained assignments through its Standard Ambulance Signature Form, which assigns "any payment for the services provided to Hawaii Life Flight." Request, Ex. 4. The issue for this Court is thus whether the indemnity promise KFHP later gave to its members could have been assigned to HLF through the Standard Ambulance Signature Form signed at the time of transport.

The court in Brewer Environmental Industries, LLC v. Matson Terminals, Inc. faced the same basic issue. As the court there framed it, the "key issue" was whether "an assignment of rights [could] be applied prospectively so as to include similar rights acquired by the assignor at a later time[.]" No. CIV. 10-00221 LEK-KSC, 2011 WL 1637323, at *11 (D. Haw. Apr. 28, 2011). In that case, a company ("Brewer") obtained a worker's compensation policy from an insurer ("Seabright"). Id. at *9. Through that policy, "Brewer contractually assigned its rights to Seabright to recover from third-parties [sic] any payments made under the policy." Id. (internal citation omitted). Brewer then later entered into an agreement with the defendants, which contained a provision by which the defendants would indemnify Brewer for certain liabilities. Id. at *1.

The court rejected the plaintiffs' argument that the assignment included the later-acquired indemnification rights, reasoning that under Fireman's Fund Insurance, Brewer only

transferred to Seabright "its rights as they existed prior to the assignment." Id. at *11 (holding that "Brewer's subsequently-acquired indemnity rights were not part of that transfer and therefore cannot be enforced by Seabright").[34]  As such, the court concluded that Seabright lacked standing to pursue a breach of contract claim, as it had no enforceable contract rights against the defendant.  Id.

Here, the Court is faced with essentially the same situation.  HLF obtained assignments from the Assignors at the time of transport.  See Compl. ¶ 1; Opp. at 30; Request, Ex. 4.[35] After transport and when HLF and KFHP began to dispute the billing issues, KFHP offered to its members defense and indemnification.  See Request, Exs. 1-3.  Just as in Brewer, the indemnification rights were obtained sometime after the assignment was made, and those subsequently obtained rights were not part of the transfer of rights.  As such, the Court

---

[34] The court in Brewer noted that it "was unaware of any Hawai'i cases that have expanded this principle to include legal rights that the assignor acquired after the assignment."  2011 WL 1637323, at *11.  This Court has also been unable to locate any such authority in Hawaii.

[35] In its Opposition, HLF does not assert that there has been any other assignment of rights apart from that given in the Standard Ambulance Consent Form.  See Opp. at 30.

concludes that HLF lacks standing to bring a breach of contract action based on KHFP's promises of indemnification.[36]

### D. Whether ERISA Preempts Count IV

Finally, KFHP argues that the breach of contract claim is preempted by ERISA because it is based on the same communications KFHP sent to members as an ERISA fiduciary that this Court previously found warranted preemption. Motion at 25-26. While the Court need not reach the preemption issue, given its determination above that HLF's claim is not ripe and HLF does not have standing to bring this claim, it nevertheless has determined that a discussion of preemption is warranted here.

As this Court discussed in its prior Order, ECF No. 77 at 15-19, ERISA's preemption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Both express preemption under § 514(a), 29 U.S.C. § 1144(a) and preemption due to a "conflict" with ERISA's remedial

---

[36] KFHP has argued that the assignment by its plain terms does not include indemnification. See Reply at 18. However, even if the term "payment" could be construed to include indemnification rights, the Assignors could still only assign those rights that existed at the time of assignment. As such, the Court does not need to reach the interpretation of the term because the Assignors did not have this right at the time of assignment to the extent it was not included in the benefits plans. See Request, Ex. 4. The Court discusses infra HLF's position that the benefits plans should be construed to include the indemnity promises if they are held preempted.

scheme are sufficient to "defeat state-law causes of action on the merits." Fossen v. Blue Cross & Blue Shield of Mont., Inc., 660 F.3d 1102, 1107 (9th Cir. 2011).

ERISA preempts state laws insofar as they "relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). The Supreme Court has repeatedly observed that "the express pre-emption provisions of ERISA are deliberately expansive." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987). "The key to § 514(a) is found in the words 'relate to.' Congress used those words in their broad sense, rejecting more limited pre-emption language that would have made the clause 'applicable only to state laws relating to the specific subjects covered by ERISA.'" Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98 (1983)). The Supreme Court has said that "a law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw, 463 U.S. at 96-97; see also Ingersoll, 498 U.S. at 139 ("Under this 'broad common-sense meaning,' a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect."); Wise v. Verizon Commc'ns, Inc., 600 F.3d 1180, 1190, (9th Cir. 2010) ("[W]here 'the existence of [an ERISA] plan is a critical factor in establishing liability' under a

state cause of action, the state law claim is preempted.")
(quoting Ingersoll, 498 U.S. at 136).

In order to determine whether a common law claim has
"reference to" an ERISA plan, "the focus is whether the claim is
premised on the existence of an ERISA plan, and whether the
existence of the plan is essential to the claim's survival."
Oregon Teamster Emp'rs Trust v. Hillsboro Garbage Disposal,
Inc., 800 F.3d 1151, 1155 (9th Cir. 2015) (quoting Providence
Health Plan v. McDowell, 385 F.3d 1168, 1172 (9th Cir. 2004).
In determining whether a claim has a "connection with" an ERISA
plan, the Ninth Circuit uses a "relationship test . . . under
which a state law claim is preempted when the claim bears on an
ERISA-regulated relationship, e.g., the relationship between
plan and plan member, between plan and employer, [or] between
employer and employee." Paulsen v. CNF Inc., 559 F.3d 1061,
1082 (9th Cir. 2009); Oregon Teamster, 800 F.3d at 1156. More
broadly, both the Supreme Court and the Ninth Circuit have
recognized that "[t]he basic thrust of the pre-emption clause .
. . was to avoid a multiplicity of regulation in order to permit
the nationally uniform administration of employee benefit
plans." N.Y. State Conference of Blue Cross & Blue Shield Plans
v. Travelers Ins. Co., 514 U.S. 645, 657 (1995); Paulsen, 559
F.3d at 1082.

Importantly, "pre-emption does not occur...if the state law has only a 'tenuous, remote, or peripheral' connection with covered plans, as is the case with many laws of general applicability." Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co., 135 F.3d 671, 677 (9th Cir. 1998) (citation omitted). "[T]he objective of Congress in crafting Section 1144(a) was not to provide ERISA administrators with blanket immunity from garden variety torts which only peripherally impact daily plan administration." Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d 974, 984 (9th Cir. 2001). In addition, "ERISA doesn't purport to regulate those relationships where a plan operates just like any other commercial entity – for instance, the relationship between the plan and its own employees, or the plan and its insurers and creditors, or the plan and the landlords from whom it leases office space." Gen. Am. Life Ins. Co. v. Castonguay, 984 F.2d 1518, 1522 (9th Cir. 1993).

The Ninth Circuit has recognized that the "relate to" language of ERISA's preemption provision "has been the source of great confusion and multiple and slightly differing analyses." Paulsen, 559 F.3d at 1081; see also Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson, 201 F.3d 1212, 1216 (9th Cir. 2000), as amended by 208 F.3d 1170 (9th Cir. 2000) ("Developing a rule to identify whether ERISA preempts a given state law . . . has

bedeviled the Supreme Court.") (emphasis omitted).  For example,

in Johnson v. Lucent Technologies, Inc., the Ninth Circuit

recently held that an intentional infliction of emotional

distress claim based on the termination of benefits was

preempted by ERISA because, "but for Lucent's termination of

benefits, there would have been no grounds for Johnson's state

law action."  No. 14-56542, 2016 WL 5390352, at *2 (9th Cir.

Sept. 27, 2016) (unpublished).  In Busse v. Shaklee Corp., the

court found a misappropriation of funds claim preempted because

"without the [ERISA] plans, there would be no tort of removing

plaintiff's pension rights from the pension records."  No. C 10-

359 SI, 2010 WL 1346406, at *7 (N.D. Cal. Apr. 6, 2010).

        By contrast, in Providence Health Plan, the Ninth

Circuit found a breach of contract claim was not preempted where

the plan sued the plan participant pursuant to the reimbursement

provision of the insurance plan.  385 F.3d at 1171.  The plan

paid medical benefits to the participant after a car accident,

and the participants then sued the driver of the vehicle and

obtained a settlement.  Id.  The plan then sought reimbursement

of the benefits it had provided.  Id.  The Ninth Circuit

reversed the district court's holding that the breach of

contract provision was not preempted, reasoning that the plan

was simply trying to enforce its contract and "[a]djudication of

its claim does not require interpreting the plan or dictate any

sort of distribution of benefits" and as such did not "relate to" the plan. Id. at 1172.

Here, KFHP has offered to its members who received air ambulance services from HLF defense and indemnification. See Request, Exs. 1-3. HLF has alleged that these promises were made "outside of the plans and independent of ERISA, FACC ¶ 225, and as such, asserted that they are not preempted. Opp. at 31. HLF has additionally reiterated that on a motion to dismiss, the Court must construe the FACC's allegations in the light most favorable to HLF. However, "only pleaded facts, as opposed to legal conclusions, are entitled to assumption of truth." Corinthian Colls., 655 F.3d at 991. Whether KFHP's indemnity offer gives rise to an independent legal duty is a question of law. See Shaw v. Santa Monica Bank, 920 F. Spp. 1080, 1086 (D. Haw. 1996) (whether a legal duty exists for purposes of a negligence action is a question of law for the court); see also Sikiyan v. Morris, No. CV16-1699 PSG (JCX), 2016 WL 3131022, at *4 (C.D. Cal. May 31, 2016), appeal dismissed sub nom. JANET SIKIYAN v. GABRIELLE MORRIS, ET AL (June 28, 2016), and appeal dismissed sub nom. JANET SIKIYAN v. GABRIELLE MORRIS (July 8, 2016) ("The determination of duty is primarily a question of law."). As such, the Court may determine whether KFHP's indemnity promise is independent of the ERISA plan and need not assume the truth of HLF's allegation.

Applying the Ninth Circuit's relationship test, the Court concludes that the breach of contract claim at issue here bears on an ERISA-regulated relationship. Although HLF is now asserting the claim as an assignee of the claim, the indemnification promises originally arose between KFHP and its members who received HLF's air ambulance services. Indeed, the letters KFHP sent indicate that it was acting on behalf of the plan members. See Ex. 1 ("As a nonprofit health plan, we believe it is our responsibility to challenge excessive billing like this to keep our health care coverage affordable for members like you."); Ex. 3 ("Kaiser is taking every step to address the situation in a manner that will service the interests of both its Members and the larger public."). The indemnity thus bears on the relationship between KFHP and its members. "Any regulation of the relationship is basis enough for preemption." Gen. Am. Life Ins. Co., 984 F.3d at 1522.

The Court comes to the same conclusion relying on cases like Lucent and Busee, which find that a claim "relates to" ERISA where there would be no grounds for the claim without the ERISA plan. Here, since the indemnification offer is premised on the existence of the ERISA plan that limits or eliminates member liability for the cost of air ambulance services and a risk that a dispute regarding how KFHP processes and pays claims may result in additional liability for members,

the alleged breach of contract claim would not have arisen without the ERISA plan.  As KFHP asserts, the "indemnity promises to its members were connected to and dependent upon its relationship as the administrator of the members' health plans."[37]  Reply at 19.  Absent the ERISA plan, KFHP would not be involved in issues relating to how HLF was paid.

The Court's analysis is further bolstered by the fact that the indemnity promises are contained in letters from KFHP to plan members which this Court previously determined were sent in KFHP's role as an ERISA fiduciary in connection with a disagreement about claims processing.  ECF No. 77 at 21.  The Court accordingly concluded that HLF's counterclaim was preempted to the extent it was based on those communications. Id.

HLF has attempted to escape this holding by distinguishing between the tort claims then at issue and the contract claim here.  Opp. at 31.  However, the Court's previous opinion cannot be dispensed with so easily.  The Court did not hold that the particular statements relevant to the tort claims were made in connection with the claims processing dispute.

---

[37] Although KFHP does not explicitly claim to be acting in its fiduciary capacity in its communications to members regarding the indemnification, the effect of its indemnification offer is to uphold the interests of its members and ensure that their ultimate liability is limited to the extent set forth in their plans.

Rather, the Court held more broadly that the preempted claims "ar[o]se out of communications from KFHP to its members, which were sent in the context of a dispute about the denial of benefits" and that to the extent the claims were "based on this communication" they were preempted.  ECF No. 77 at 20-21.

Indeed, the letters themselves make clear that the indemnity promises are being given precisely because of the claims processing dispute.  See Request, Ex. 1 ("We are currently in negotiations with Hawaii Life Flight and recently learned it was asking members like you to pay amounts above what we believe are reasonably owed to them....If you have made payment to Hawaii Life Flight in response to its additional letters or phone calls...we will reimburse you for verified payment amounts."); Ex. 3 ("Kaiser is aware of [HLF's] claim that is allegedly due unpaid fees," "is taking every step to address the situation in a manner that will serve the interests of both its Members and the larger public," and "wishes to clarify that it will also indemnify all impacted Members form HLF's baseless claims") (emphasis in original).  Such actions are, moreover, completely consistent with KFHP's fiduciary duties to its members.

At the end of the day, this claim does not involve a breach of a provider agreement made directly with the insurer concerning the rate of reimbursement, which has been held to not

sufficiently relate to ERISA.  See Blue Cross of Cal. v.

Anesthesia Care Assocs. Med. Grp., Inc., 187 F.3d 1045, 1041-52

(9th Cir. 1999) (finding breach of contract claim not

preempted).  Rather, HLF's breach of contract claim involves

HLF, purportedly standing in the shoes of plan members, suing

the retirement plan.  This is "a relationship comprehensively

regulated by ERISA."  Borton v. New United Motor Mfg., Inc., No.

3:10-CV-00253-RCJ, 2010 WL 3259907, at *6 (D. Nev. Aug. 17,

2010) (finding fraud and negligent misrepresentation claims by

plan member against retirement plan preempted);[38] see also Barr

v. Am. Cynamid Co., 808 F. Supp. 752, 759 (W.D. Wash. 1992)

(finding alleged misrepresentations concerning supplemental

benefits available under voluntary severance program to ERISA-

covered employees was preempted as "related to" an ERISA plan).

As such, HLF's breach of contract claim is preempted.

Finally, the Court turns to HLF's request that if the

indemnity agreements are preempted by ERISA, the Court "make

clear" that they "are preempted because they are part of

_____

[38] In its conclusion, the court in Borton relied on Davidian v.
Southern California Meat Cutters Union & Food Employees Benefit
Fund, 859 F.2d 134 (9th Cir. 1988), which affirmed a finding of
preemption as to claims for bad faith, fraud, deceit, and breach
of fiduciary duty by a plan member against a plan.  There, a
representative of the plan allegedly misled him as to the
limitations of various health insurance plans from which he
could choose on retirement, and the Ninth Circuit concluded that
these claims were preempted because they related to the
administration of an employee benefit plan.  859 F.3d at 135.

Kaiser's ERISA benefits plans" which have been assigned to HLF. Opp. at 32. However, HLF has not alleged in the FACC that KFHP's indemnity promises were intended to or did modify or alter the Assignors' benefits plans. See generally FACC. Nor has HLF addressed the fact that this Court rejected in the Sidlo litigation the claim that "KFHP modified the plan by substituting indemnity benefits in place of healthcare benefits without properly notifying members." ECF No. 56 at 50. Indeed, the Court determined that "there is no indication that KFHP modified the plan." Id. at 62. Rather "[by] offering to indemnify members against any attempts by HLF to recover the remainder of its medical transport bills, KFHP sought to protect its members in the midst of a rate dispute with one of its providers." Id. In addition, "[t]he letter KFHP sent to Sidlo offering to provide him with free legal services did not purport to replace any benefits Sidlo was due under the plan." Id.

Finally, HLF's request may imply a concern there could be limited recourse regarding Kaiser's indemnity promises. However, the Court notes that HLF has not actually cited to a gap in recovery rights and that there may be possible equitable remedies available under ERISA. See, e.g., ECF No. 56 (discussing equitable estoppel under ERISA). Regardless, the Ninth Circuit has held that even if such a gap exists, it "does not undermine the reasoning on which a finding of preemption is

based." <u>Olson v. Gen. Dynamics Corp.</u>, 970 F.2d 1418, 1423 (9th Cir. 1991).  This is because "[t]here is simply no reason to assume that Congress intended ERISA's preemptive reach to be coextensive with the Act's civil remedial scheme" and any resulting gap "is exactly the result that obtains when Congress determines that federal law should govern a broad area to the exclusion of state regulation and chooses not to prohibit the actions formerly prohibited by state law." <u>Id.</u>; <u>see also</u> <u>Bast v. Prudential Ins. Co. of Am.</u>, 150 F.3d 1003, 1009-10 (9th Cir. 1998), <u>as amended</u> (Aug. 3, 1998) ("Although forcing the Basts to assert their claims only under ERISA may leave them without a viable remedy, this is an unfortunate consequence of the compromise Congress made in drafting ERISA.").  As such, the Court declines to find that KFHP's indemnity promises are part of the ERISA benefits plans.

Based on all of the foregoing, the Court accordingly GRANTS KFHP's Motion as to Count IV WITH PREJUDICE and WITHOUT LEAVE TO AMEND.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant KFHP's Motion to Dismiss.  The Court GRANTS IN PART and DENIES IN PART KFHP's Motion as to Count III.  The Court's partial grant as to Count III is WITH PREJUDICE and WITHOUT LEAVE TO AMEND.  Counts I and II are

dismissed WITHOUT PREJUDICE and WITH LEAVE TO AMEND.  Count IV
is dismissed WITH PREJUDICE.  The Court DIRECTS that HLF shall
file its next amended counterclaim within 30 days of the date of
this Order.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, April 27, 2017.



_____
Alan C. Kay
Sr. United States District Judge

Kaiser Foundation Health Plan, Inc. v. Hawaii Life Flight Corporation, et
al., Civ. No. 16-00073 ACK-KSC, Order Granting In Part and Denying in Part
Counterclaim Defendant Kaiser Foundation Health Plan, Inc.'s Motion to
Dismiss Counterclaim Plaintiff Hawaii Life Flight Corporation's First Amended
Counterclaim.